**SECURITIES AND EXCHANGE COMMISSION, Petitioner,**

v.

**F. Wallace BOWLER, Bennie E. Barnett, Eastern Investment Corporation, Eastern Finance Corporation, Eastern Credit Corporation, United Corporation of America, American Loan and Finance Company, Columbia Finance Corporation, Respondents.**

No. 14532.

United States Court of Appeals, Fourth Circuit.

Argued May 7, 1970.

Decided June 2, 1970.

David Ferber, Solicitor, Securities and Exchange Commission (Philip A. Loomis, Jr., Gen. Counsel, Richard E. Nathan, Special Counsel, Harvey L. Pitt and James F. Whitescarver, Jr., Atty's, Securities and Exchange Commission, on the brief), for appellant.

Richard B. Spindle, III, Norfolk, Va., (Thomas G. Johnson, Jr., and Willcox, Savage, Lawrence, Dickson & Spindle, and Alvord & Alvord, Washington, D. C., on the brief), for appellees.

Before BOREMAN, BRYAN and WINTER, Circuit Judges.

WINTER, Circuit Judge:

This suit was instituted by the Securities and Exchange Commission (the "Commission") to enjoin violations of the registration and antifraud provisions of the Securities Act of 1933, 15 U.S.C.A. §§ 77e(a) (c) and 77q(a), which occurred in the sale of securities of corporate defendants who were under common control. The district court granted a permanent injunction, but it denied the Commission's request for the appointment of a receiver for each of the corporate defendants. Instead, it approved a plan of reorganization of the corporate defendants as proposed by them and the principals who control them. From the order denying appointment of the receiver and approving the plan, the Commission appeals.

We reverse and direct the appointment of a receiver and further proceedings consistent with this opinion.

I

Defendant F. Wallace Bowler ("Bowler") was the president, a director and the stockholder who controlled each of the corporate defendants. Defendant Bernie E. Barnett ("Barnett") was the chief financial officer and a director of

each. The identity, intercorporate relationship and ownership of each of the corporate defendants are indicated in the following diagram:

Eastern Investment Corporation is a holding company, as is Eastern Finance Corporation at the present time. Eastern Credit Corporation is engaged in the small loan business and operates from offices in the mid-Atlantic area. United Corporation of America is a holding company. Both American Loan and Finance Company and Columbia Finance Corporation are engaged in the small

loan business with operating offices in Ohio and Indiana, respectively.

Members of the public own the defendants' equity and debt securities, the latter of which amount to $7,098,383. The Eastern group (Eastern Investment Corporation, Eastern Finance Corporation and Eastern Credit Corporation) issued and has outstanding $2,497,053 worth of these debt securities, and the United group (United Corporation of America, American Loan and Finance Company, and Columbia Finance Corporation) issued and has outstanding an additional $4,601,330.

### A. *Violations of the Securities Act of 1933*

Although the defendants did not seriously resist the injunction against further violations of the registration and antifraud provisions of the Securities Act of 1933, it is necessary to describe some of the violations which occurred because of the light which they shed on the desirability from the standpoint of public security holders of the individual defendant's continued control or participation in the control of the corporate defendants.

Over a period of years, defendants have utilized the sale of debt and equity securities to the public as a major source of financing. In 1968 and 1969 there was a public offering of Eastern Finance's 7% short-term notes. In the sale of these securities financial data and other written material prepared by Barnett, with the approval of Bowler, were used, even though audited statements were available which presented a very different picture. The materials provided to public investors overstated the assets of Eastern Finance by at least $8,975,018 and failed to indicate that the liabilities of Eastern Finance actually exceeded its assets by approximately $300,000. There was nondisclosure of the fact that Eastern Finance had sustained operating losses of approximately $190,000 for the fiscal year ended September 30, 1967, and $159,393 for the fiscal year ended September 30, 1968, or that on the latter date its liabilities continued to exceed its assets by approximately $120,000. Other significant information was not disclosed. In the latter part of January, 1969, the Virginia State Corporation Commission advised the defendants to discontinue the offer and sale of these notes. The defendants agreed to discontinue, but, nevertheless, continued the sales until they were told a second time to desist.

American's 3-year and 5-year promissory notes were offered and sold to the public through salaried investment officers and loan office managers beginning in 1968. A false and misleading brochure and an unaudited financial statement prepared by Barnett were used, even though more accurate information and audited financial statements were available or could have been obtained. Contrary to generally accepted accounting principles which required receivables to be reported net of an unearned discount, the defendants overstated American's assets by approximately $1,700,000 by reporting only the gross figure. The extent of American's current obligations was distorted by the failure to reflect as a current obligation that portion of notes outstanding which matured within twelve months. The purchasers were not informed of the relationship between American, its parent United and the other corporate defendants, nor was there disclosure of the common control and intercorporate transactions which were a part of their operations. Neither were these facts disclosed in the offering of Eastern Finance's 7% · short-term notes, in spite of the written advice of the auditors of one member of the corporate group that it was necessary to disclose material transactions between affiliated corporations in any financial statement.

Early in 1969, American also sold stock to its existing noteholders by means of an offering letter and an unaudited financial statement purporting to reflect American's financial condition as of December 31, 1968. While defendants had

an audited statement prepared for American which stated its position as of November 30, 1968, they did not make it available in selling these securities. There was no disclosure of the history of losses in operations sustained by American's parent company United or of the substantial deficit in United's retained earnings which had been eliminated only by a quasi-reorganization as of February 29, 1968. There was also no disclosure of the fact that when United purchased American in 1968, American had lost all of its lines of credit aggregating $5,000,000 with approximately nineteen banks in Ohio and Indiana, and that a substantial number of the loans with these banks went into default upon maturity.

There were numerous instances of defendants' failure to register securities that were being offered publicly. In May, 1969, Columbia commenced the sale of 7% short-term notes to the public through newspaper advertisements in Indiana and through sales material placed in Columbia's loan offices. Eastern Investment issued unregistered long-term notes to dissatisfied shareholders of Eastern Finance in exchange for their shares over a period of approximately eight years, and no disclosure was made that Eastern Investment had negligible operations and a substantial deficit in retained earnings. Indeed, while the administrative investigation preceding the filing of this suit by the Commission was being conducted, Bowler offered and sold unregistered shares of United Oil & Gas Corporation, a subsidiary of United. There was no disclosure of the fact that the Commission investigation was pending, or that the Commission had advised the defendants to discontinue the unlawful sale of unregistered securities. Just prior to the institution of suit, the defendants represented that their sale of unregistered securities had been discontinued, but, at the same time, the sale of unregistered stock of United Oil & Gas Corporation was being continued.

B. *Intercorporate Transfers and Other Abuses*

Bowler and his family exercised their control over the corporate defendants for their own purposes. Although the obligations of Eastern Investment were consistently viewed by the auditors of the other companies as having no value, funds of the other corporate defendants were on numerous occasions advanced to Eastern Investment to permit it to purchase its securities in the open market. Eastern Investment did not pay any interest on the advances. Corporate assets were also transferred to Bowler and held in his name, ostensibly to facilitate the obtention of loans for the corporate defendants. No records were made to reflect the transfer of assets to Bowler, the receipt of any loans by the corporations, or the return of any assets to the corporation from which they were received. Assets often remained in Bowler's name after such loans as were made had been fully repaid.

Although they were under common control, operated as a single entity and served by the same auditors, the six corporations employed different reporting dates for the preparation of periodic financial information. This created opportunities to juggle accounts so as to enhance the apparent financial condition of any company as of its particular balance sheet date. The opportunities were fully utilized. On one occasion the bank reconciliation for the operating account of United, prepared under Barnett's direction with the concurrence of Bowler, showed a balance of $35,686 on April 30, 1968, based upon a deposit of $100,000 supposedly in transit to the bank. That deposit consisted of a check in that amount drawn on the account of Mutual Bankers Insurance Company, which had been signed by Barnett and his secretary. The check was not in fact deposited to United's account until May 27, 1968, the first day after the check had been drawn that Mutual had sufficient funds to pay it.

On another occasion, a check in the amount of $328,110, dated August 31, 1968, was drawn on United's account in favor of Eastern Credit. It was not deposited to the account of Eastern Credit until October 2, 1968—the same date upon which a check, dated September 30, 1968, drawn on the account of Eastern Credit in an identical amount was deposited to United's account.

In addition to kiting checks, the practice of effecting bank loans which matured within one to thirty days on or immediately before the end of reporting periods was employed to reflect a picture of liquidity as of the reporting date.

An example was a $100,000 loan obtained on behalf of United on February 28, 1967, the end of its reporting period. The funds were never removed from the bank and the loan was repaid two or three days later. Another loan of $100,000 on behalf of United was made on August 31, 1967, the end of the six-month reporting period, and this loan was repaid five days later. There was evidence that Barnett opposed making loans of this character because of their cost, but Bowler advocated such loans because they enhanced the financial status of the corporation.

## C. The Plan of Reorganization

On the second day of the hearing in this suit, defendants filed a revised plan of reorganization, which was ultimately approved by the district judge. The stated purpose of the plan was the consolidation of all of the small loan business operations of the several corporate defendants into one publicly-held operating entity, United. Eastern Investment—wholly owned by Bowler and his family—would remain the largest single shareholder in this combined enterprise with approximately 22% of the stock. All other assets of the defendant corporations would be placed in a holding company, Eastern Investment, that would continue to be wholly owned by the Bowler family. The revised plan provided that Eastern Investment, Eastern Finance and Eastern Credit "will convey the assets relating to the small loan business to * * * [United] at their fair market value in consideration of the assumption by * * * [United] of the institutional and publicly-held debt" of the members of the Eastern group. The supporting schedules which defendants filed with the revised plan indicate that United, the majority of whose shares are publicly-owned, would assume $450,000 in liabilities of Eastern Investment, while obtaining only $184,494 of its assets, and to assume $1,701,400 in liabilities presently owned by Eastern Finance, while obtaining from that company no assets whatsoever. At the same time, the shareholders of Eastern Credit, 11% of whose stock is held by members of the public, would be required to surrender its operating assets of $7,472,560 in return for the assumption by United of only $5,336,079 in debt. The companies whose liabilities are to be assumed are owned entirely or predominantly by Bowler, while 51% of the company that will assume these obligations is publicly-owned and, under the plan, will ultimately be 78% publicly-owned.

The plan provided that United Stock, presently held by Eastern Investment, would be offered to the public shareholders of Eastern Credit and Eastern Finance in exchange for their holdings in those companies. No exchange ratio was established, however, and the plan left that ratio to be determined at a future time "when the market for each stock has stabilized * * *." Shareholders unwilling to make such an exchange would be entitled to cash in accordance with appraisal rights granted to dissenting stockholders under the Virginia corporation laws.

The plan provided for the conveyance of personal assets estimated to be worth $957,000 by Bowler to Eastern Investment in exchange for new stock to be issued by that company. $375,000 of the

total value of these assets was represented by the estimated value of Bowler's shares in United, and $85,000 the worth attributed to Bowler's residence.

As approved by the district court, the plan designated John Brennant to serve as president and chief executive officer of United and its subsidiaries. The board of directors of United, consisting of six members, was designated, and included Bowler. The United stock which Eastern Investment held after the Eastern Credit and Eastern Finance shares had been exchanged for United stock was conveyed to voting trustees for a period of three years. In the event of the death or resignation of any director, a replacement would be selected by the voting trustees.

Although he approved the revised plan of reorganization, the district judge was hampered by the lack of accurate financial data to assay its effect. He experienced the same difficulty in determining the current financial status of each of the corporate defendants. Concomitant with approving the plan, he directed the preparation of a comprehensive audit of the affairs of the corporate defendants, including consolidated balance sheets and income statements for the Eastern group and the United group, valuation of the shares of United owned by the Bowler family and an appraisal of the assets proposed to be transferred by the Bowler family. We stayed the district judge's approval and implementation of the plan pending appeal, but we directed that the preparation of the financial data go forward with copies to be filed with us. The copies were received several days before argument of the appeal.

D. *Insolvency of Defendant Corporations*

The district judge made no findings with respect to the solvency or insolvency of the defendant coporations. His comments during the hearing and communications to counsel thereafter provided the bases for conflicting inferences as to what he would have found if he had made findings. It is significant, however, that a financial statement which the defendants filed at the hearing showed that Eastern Investment and its subsidiaries—the Eastern group—were insolvent on a consolidated basis. Specifically, liabilities exceeded assets by at least $411,526.

The proof with respect to the United group showed that American would be unable to redeem its 3-year notes, which it had agreed to pay on demand, on a current basis should demand for payment be made. These notes exceeded $3,000,000 in principal amount, and the United group as a whole had only $385,240 in cash as of August 31, 1969. As of May 31, 1968, United's current liability exceeded its current assets by $509,515.

## II

We do not question the strength of defendants' argument that some plan of reorganization of the corporate defendants is probably preferable to the appointment of a receiver. The latter carries connotations which may be ruinous in an industry where ready access to borrowed funds is a condition precedent to profitable operation and where prompt payment of receivables is essential. A proceeding under Chapter X of the Bankruptcy Act would be the most appropriate and most promising solution for the financial difficulties of the corporate defendants. Under it the rights of all parties, creditors and investors, could be adequately protected, and they would have full opportunity to participate and be heard in the proceedings. But defendants have not seen fit to initiate such a proceeding, and an involuntary petition for reorganization will not lie unless and until a receiver has been appointed or an act of bankruptcy has been committed. 11 U.S.C.A. § 531. Undoubtedly, this inaction stems from the reluctance of the individual defendants to undergo the surrender of

control or influence over the corporate defendants which the filing of a voluntary petition would entail.

■ We have no difficulty in concluding that the district judge committed error in approving defendants' equity-type plan of reorganization. It was objectionable on numerous grounds. In the first place, any determination of the effects of the plan would be rank speculation because of the absence of any reliable financial data. Thus, the assets to be surrendered by the Eastern group and the obligations to be assumed by the United group could not be determined. The ratio of exchange of United stock for the stock of Eastern Credit and Eastern Finance was left to be determined at some unknown future date by some unknown formula. The plan did not provide United stockholders with notice of the plan or of the fact that they would have to accept the exchange of stock or take the benefits provided by state statute to dissenting shareholders. Although defendants took the opposite position before the district judge, they now seem to concede that the plan cannot be effectuated without shareholder approval. If such approval is not forthcoming, the plan may turn out to be an empty gesture. Notice was neither given nor contemplated with respect to the creditors of any corporation whose obligations would be assumed by another defendant. While the plan contemplated an infusion of assets from Bowler which the defendants represented to be of substantial value, the benefit to stockholders and creditors of the corporate defendants may be more illusory than real. Although the financial statements which were filed after the district judge approved the plan are not conclusive and in many respects may be open to question, those statements value the Bowler assets at $407,772 instead of the value of $957,081 which the defendants represented to the district court. More importantly, these statements show previously undisclosed tax claims against Bowler, which may be asserted against

these assets, in the amount of $177,587 plus penalties and interest, and against Eastern Investment in the amount of $321,474 plus penalties and interest. While we do not accept the correctness of the government's tax claims, we do attach significance to the fact that the existence of the claims was not disclosed. Although insulated by an independent board of directors and a three-year voting trust, the plan, as conditioned by the district judge, still permits Bowler, the author of such a substantial portion of the difficulties of the corporate defendants, to retain an active, if not decisive, role in their management. At most, his domination would be diluted for only a period of three years. Certainly, the limited injunction against improper security dealings would provide no brake against mismanagement, other than security dealings in violation of the Securities Act of 1933, after the expiration of that period.

Rather than to attempt to provide relief by an unsatisfactory equity-type plan of reorganization, we think that the district judge should have appointed a receiver. There was ample warrant for this type of relief. The prayer for a receiver was ancillary to the injunctive relief to which the Commission was found to be entitled. The proof showed that the defendant corporations had been the target of fraud, mismanagement and gross abuses of trust and that they had been used as vehicles for the private purposes of the individual defendants. Fraud had been perpetrated on public security holders, and the rights of public security holders and creditors were proposed to be given scant protection in the plan of reorganization. In a case having many similarities to the case at bar, Securities and Exchange Com'n. v. Keller Corporation, 323 F.2d 397 (7 Cir. 1963), the Seventh Circuit made a statement, apposite to the case at bar:

> The district court was vested with inherent equitable power to appoint a trustee-receiver under the facts of this case. The prima facie showing

of fraud and mismanagement, absent insolvency, is enough to call into play the equitable powers of the court. It is hardly conceivable that the trial court should have permitted those who were enjoined from fraudulent misconduct to continue in control of Kellco's affairs for the benefit of those shown to have been defrauded. In such cases the appointment of a trustee-receiver becomes a necessary implementation of injunctive relief. 323 F.2d at 403.

See also Los Angeles Tr. D & M Exch. v. Securities & Exch. Com'n., 285 F.2d 162, 181 (9 Cir. 1960), cert. den., 366 U.S. 919, 81 S.Ct. 1095, 6 L.Ed.2d 241 (1961); Aldred Inv. Trust v. Securities and Exchange Commission, 151 F.2d 254, 260–261 (1 Cir. 1945), cert. den., 326 U.S. 795, 66 S.Ct. 486, 90 L.Ed. 483 (1946).

■ Defendants resist strongly the appointment of a receiver on the ground that the defendant corporations were not insolvent. The short answer is that the authorities cited do not limit the appointment of a receiver to cases where insolvency is shown. Rather, a receiver is permissible and appropriate where necessary to protect the public interest and where it is obvious, as here, that those who have inflicted serious detriment in the past must be ousted. *Cf.* Taylor v. Standard Gas & Electric Co., 306 U.S. 307, 324, 59 S.Ct. 543, 83 L.Ed. 669 (1939). Moreover, by defendants' own proof, there was a basis for finding insolvency of the Eastern group on a consolidated basis. Although, as equitable relief, the disadvantages and possible deleterious effect of the appointment of a receiver must be weighed against the considerations indicating the need for such relief, we are satisfied that the balance supports the Commission's request.

The order of the district court is reversed and the case remanded for the appointment of a receiver and further proceedings consistent with this opinion.

*Reversed and remanded.*