**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

**v.**

**R. J. ALLEN & ASSOCIATES, INC., et al., Defendants.**

**Civ. A. No. 74–1273–Civ–CF.**

United States District Court, S. D. Florida.

Nov. 29, 1974.

Michael J. Stewart and Michael K. Wolensky, S. E. C., Miami, Fla., for plaintiff.

Marx & Squitero, Miami, Fla., and Lionel Barnet, Miami Beach, Fla., for defendants.

## MEMORANDUM OPINION

FULTON, Chief Judge.

The plaintiff Securities and Exchange Commission ("Commission") filed its Complaint herein against the corporate and individual defendants on October 1, 1974, seeking injunctive and ancillary relief for alleged violations of Section 17(a) of the Securities Act of 1933, as amended, ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934, as amended ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b–5 promulgated thereunder [17 CFR 240.10b–5].[1] The Commission sought a Temporary Restraining Order and Preliminary and Permanent Injunctions pursuant to Section 20(b) of the Securities Act [15 U.

---

1. Section 17(a) of the Securities Act of 1933 provides:

It shall be unlawful for any person in the offer and sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

(1) to employ any device, scheme or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

Section 10 of the Exchange Act provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

(a) * * *

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Rule 17 CFR 240.10b–5, promulgated by the Commission pursuant to Section 10(b), provides:

It shall be unlawful for any person, directly or indirectly, by use of any means or instrumentality of interstate commerce, or of any facility of any national securities exchange—

(1) to employ any device, scheme or artifice to defraud,

(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

S.C. § 77t(b)] and Section 21(e) of the Exchange Act [15 U.S.C. § 78u(e)], also sought an accounting, disgorgement, appointment of a receiver, and establishment of a trust over the defendants' assets as additional equitable relief to effectuate the remedial purposes of the federal securities laws and to protect those investors allegedly defrauded by the defendants.

On October 2, 1974, the Court, on the Commission's application, entered a 10-day Temporary Restraining Order prohibiting further violations of the aforementioned anti-fraud provisions of the federal securities laws after having considered the Complaint and sworn affidavits filed therewith and having heard testimony showing a reasonable expectation that the defendants would thwart the policy of the securities acts based upon their prior activities. As a part of that Order, the Court appointed David Hughes as temporary equity receiver for the defendant R. J. Allen & Associates, Inc. ("R. J. Allen") and established a trust over the assets of all of the defendants to prevent their dissipation, concealment or disposition and the destruction or alteration of any books and records. By the terms of the Order, the individual defendants were permitted to use their personal funds for ordinary and necessary living expenses.

Subsequently, at a hearing on October 4, 1974, the attorneys for R. J. Allen were ordered to turn over to the Receiver all books and papers of R. J. Allen in their possession except for personal documents of the individual defendants which were ordered to be sealed and placed with the Court for *in camera* inspection. At that time, a hearing on the Commission's motion for a preliminary injunction was set down for October 11, 1974.

That hearing commenced on October 11, 1974, and lasted until Octover 18, 1974. All of the defendants were present and were represented by counsel except for Thomas A. Preston ("Preston"), who appeared *pro se*. During the course of the hearing, by stipulation of the parties and Order of the Court, the hearing on the preliminary injunction was consolidated with the trial on the merits pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure. On October 11, 1974, for good cause shown, the Temporary Restraining Order was extended for a 10-day period, or until further Order of the Court, whichever was the lesser, to permit the Court to resolve the matter on the merits while maintaining the *status quo* under that Order. Also, on October 11, 1974 during the course of the hearing, the Commission moved to dismiss as to the defendant Lee Ridgley (a/k/a Dorothy Maxine Ridgley) its prayer for disgorgement and the trust over her personal assets. At the same time, a stipulation and consent to a permanent injunction, without admitting or denying the allegations of the Complaint, was filed by Ridgley and the Commission and an Order based thereon permanently enjoining her from violations of the anti-fraud provisions in connection with the offer, sale or purchase of any security was entered on October 18, 1974. The Court entered an Order *ore tenus* on October 18, 1974, in contemplation of this Memorandum Opinion and hereby adopts and incorporates that Order herein.

Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, this Memorandum Opinion shall constitute the Court's Findings of Fact and Conclusions of Law which the Court does hereby adopt. All pending Motions are hereby integrated into and resolved by this Memorandum Opinion.

## JURISDICTION

At the outset, the defendants challenged the jurisdiction of the Court over the subject matter of the Commission's Complaint and the parties alleging that their activities were exempt from the provisions of the Securities Act sought to be enforced by this action. The Court, having considered the motion, has determined that it has jurisdiction over the parties to and the subject matter of this cause pursuant to the anti-fraud

provisions of the federal securities laws: Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b–5 thereunder.

Even though Congress provided certain exemptions from the registration provisions of the Securities Acts, there are no exemptions from the anti-fraud provisions cited above. Section 17(c) of the Securities Act [15 U.S.C. § 77q(c)] makes this clear. Section 17(a) of the Securities Act and its analogous provision in the Exchange Act—Section 10(b) and Rule 10b–5—apply to the transactions involved herein. *See*, S. E. C. v. Charles A. Morris & Associates, Inc., 386 F.Supp. 1327 (W.D.Tenn., 1973) CCH Fed.Sec.L.Rept. ¶ 93,756. The evidence clearly shows, and the defendants do not contest, that in connection with their activities, the defendants employed the mails and the means and instrumentalities of interstate commerce and communication. Therefore, this Court has jurisdiction of this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

The defendants R. J. Allen, Robert J. Allen ("Allen"), Howard W. Alexander ("Alexander"), Charles J. Diaz ("Diaz") and Preston are and have been inhabitants of the Southern District of Florida. All have transacted business within the District, were duly served with process herein and have entered a general appearance in this action. Therefore, the Court has personal jurisdiction over the parties to this action with venue properly lying in this District.

## FACTUAL BACKGROUND

R. J. Allen, a Florida corporation organized in August, 1972 under the laws of the State of Florida, maintains offices in Ft. Lauderdale, Florida. Prior to February 26, 1974, when the company's name was changed by charter amendment, it was known as Alexander and Allen, Inc. From about November 1972 to October 1974, R. J. Allen, under the direction, control, and management of Allen and Alexander, engaged in the securities business and, in particular, in the offer and sale of securities commonly referred to as "municipal bonds." R. J. Allen was registered as a broker-dealer with the State of Florida but not with the Commission.

The defendant Alexander has been president, a director and a principal shareholder of R. J. Allen from its inception until late November, 1973. He, along with other principals, was responsible for the management and control of the firm's activities. These included the approving of transactions with customers, directing the salesmen to make representations regarding insurance on the bonds being sold, execution of repurchase agreements, and negotiations of underwriting agreements with issuers, among others.

The defendant Allen served as executive vice-president and later president, a director and was a principal shareholder of R. J. Allen. He was responsible for certain of the firm's activities, including the approval of customer transactions, control of all bookkeeping activities and negotiation for insurance and underwriting agreements. The evidence was manifest that Alexander and Allen totally controlled the activities of R. J. Allen.

Diaz was executive vice-president and sales manager for R. J. Allen. His duties included the hiring and firing of salesmen, approval of customer transactions, the conducting of "training sessions" for salesmen of R. J. Allen and the closing of difficult sales with customers who were hesitant about investing. In addition, Diaz personally engaged in sales activities with his own customers and demonstrated the telephone selling techniques employed by the firm to new salesmen.

The defendant Preston was a salesman for R. J. Allen during the period from January, 1973 through approximately March, 1974. At that time, Preston left R. J. Allen to take over Coral Ridge Investments, Inc., another "municipal bond" dealer located in Ft. Lauderdale, Florida. He is still in the securities business.

As a part of its business, R. J. Allen, through its principals Allen and Alexander, and certain salesmen, including Diaz and Preston, engaged in the offer, sale, and underwriting of Industrial Development Revenue Bonds ("IDR's") of numerous issuers. These bonds, while generally included in the class of "municipal bonds" are of a particular type in that they are not general obligation bonds of a political entity, nor are they backed by the full faith and credit of any municipality, state, or local taxing unit. Rather, their viability depends in full measure upon the ability of the company funded by the proceeds from the bond sales to generate sufficient revenues to meet the principal and interest payments due on the bonds. As such, IDR's are speculative, high-risk securities includable in the class of "municipal bonds" only because of the tax-exempt feature of the interest payments made to the investors in them.

With this background, the Court will now address itself to the sales practices employed by the defendants in selling IDR's. It should be noted that the expert in the field of municipal bonds called by the Commission testified that many of the IDR's on the market are sound investments because of the companies behind them but that those IDR's sold by the defendants were among the worst, from an investment standpoint, that he had seen in 24 years in the business. The evidence clearly demonstrated that Allen and Alexander together with the other defendants concocted a scheme to deceive and defraud investors by making misleading and false statements and in withholding and secreting information that should have been revealed. In addition to these activities, the defendants engaged in the practices of "switching" by delivering bonds to investors other than those the investors had purchased and "bucketing" by failing to execute purchase transactions after having received a customer's funds to pay for his purchase.

As a part of their scheme, the defendants, and particularly the defendant Preston, in early 1973 began a solicitation program directed at returning Vietnam Prisoners of War who had amassed substantial sums as backpay during their years of imprisonment. The evidence showed that Preston directed a "Welcome Home" letter to some eighty (80) of these men after their return to the United States, offering to aid them in preserving their hard-earned compensation with safe and secure investments through R. J. Allen. The testimony demonstrated that these customers of R. J. Allen were unsophisticated in financial matters, having had little or no experience in investing. They reposed their trust in the advice given them by the defendants.

Alexander and Allen were aware of Preston's solicitation of the Prisoners of War ("POW's") and gave their approval to his activities. Preston, in the initial letter, indicated he had a special empathy with the POW's because he had been one himself during the Korean conflict and did not want to see them waste their backpay as he had done. Despite Preston's testimony that he had been a prisoner for 28 hours, his military records in evidence do not disclose that he was ever held in a prisoner status. The Court finds that this representation by the defendants was false and misleading and was intended to and did generate confidence and trust in the POW's solicited by Preston.

Once initial contact had been made, Preston engaged in a program of telephonic and written solicitation with the POW's, always using the facilities, stationery, postage, etc., provided to him by R. J. Allen in an effort to secure an investment in the high-risk, speculative IDR's being sold by the defendants while representing that these securities were safe, secure, and liquid investments and that they were suitable for the investment purposes of the POW's. The defendants represented to some of the POW's that R. J. Allen would hold their bonds in "trust" for them or else deliver them promptly. As the evidence shows, none of these representations was true.

While engaging in their solicitation activities, the defendants Preston, Allen, Alexander and R. J. Allen failed to inform the prospective purchasers of the speculative nature of the IDR's, that they were not general obligations of or backed by the full faith and credit of any governmental body, or that the bonds purportedly held in trust were not so held. In connection with one particular IDR, Tuskegee, Alabama IDR's for All Enterprises, Inc., the defendants failed to disclose to the investors that Allen and Alexander were principals of All Enterprises and A & A Enterprises, a related company, and would derive substantial benefits from any sales of that bond issue. The evidence discloses that All Enterprises received in excess of $550,000 from that bond issue on requisitions put in by Alexander which were not verified by the Tuskegee Industrial Development Board.

While Preston was directing his sales campaign toward returning POW's, Diaz, who was sales manager and vice-president of R. J. Allen, with the aid of the other defendants, engaged in soliciting the general public through newspaper advertisements and "cold canvass" telephone calls. Diaz, like Preston, made the misrepresentations and omissions set out above and also engaged in other deceptive and fraudulent tactics. He directed that salesmen should send out confirmations after all telephone solicitations even if the customer had not placed an order so that some customers might accept the transactions and pay for the securities even though they were never ordered. After Preston left R. J. Allen in the spring of 1974, Diaz took over Preston's accounts and continued the ruse of the "trust accounts" initiated by Preston in correspondence with numerous investors.

In addition to the misrepresentations and omissions set out above, the defendants engaged in certain practices which so pervaded their business that they rendered the entire operation a fraudulent and deceptive scheme and course of conduct designed to defraud investors. These practices, which are detailed below, include: (1) assurances to customers relating to insurance; (2) assurances to customers relating to repurchase; (3) "switching"; and (4) "bucketing."

The evidence was uncontradicted that the defendants Allen, Diaz, and Alexander instructed sales personnel to tell all customers that the interest and principal payments on the bonds sold by R. J. Allen were insured and three (3) salesmen so testified. Much of the selling literature also contained this statement, as did confirmations sent to customers. The fact was, however, that the only insurance discussed between R. J. Allen and any insurance carriers related to an errors and omissions policy with the Mission Insurance Company of Los Angeles, California, which covered errors and omissions by the trustee bank and the Industrial Development Board and not any default on the bonds. This policy was voided *ab initio* by the carrier shortly after it was written because R. J. Allen had stopped payment on its initial premium check. The salesman who handled the matter testified that he admonished Allen not to represent nor to permit his salesmen to represent that default on payment of principal and interest was insured and this was later confirmed by letter to Allen at R. J. Allen. Subsequently, Allen instructed his salesmen to make the above-noted representation in their selling campaign.

Several investor witnesses testified and documentary evidence showed that R. J. Allen, Allen and Alexander promised to repurchase the bonds sold to customers at some future date for the amount the investor had paid. This repurchase promise was not kept, however, despite repeated requests by R. J. Allen's customers, except for one instance where two elderly ladies, after daily visits to the defendant's offices for a three-month period, were given nominal repayment for some of the bonds they attempted to have repurchased. Written re-purchase agreements signed by Alexander and Allen were executed

for at least two investors whose investment amount totalled $150,000, yet no bonds were ever even purchased by R. J. Allen for delivery to these customers.

Another device employed by the defendants was that of "switching" customers. This was accomplished by convincing the customer to order a particular bond, then sending him a confirmation of the purchase and delivering a bond issue other than that ordered. Upon inquiry, the customers were advised that the substituted bonds were just as good, or better than, those originally ordered and worth just as much. In at least one instance, a customer was "switched" into $25,000 face amount of bonds known as "fractionals" because of the very low (0.05%) interest rate. Due to this very low interest rate, these particular bonds were selling at a discount and were worth approximately 15% of their face value on the market. Thus, this customer was delivered $25,000 face amount of bonds he did not order which were actually worth about only $4,000.00.

Another course of business employed by the defendants is known as "bucketing." This is a practice whereby a broker accepts a client's money without ever buying or selling securities as the client ordered and pocketing the money paid by the customer for his purchase. The evidence showed that at least eight (8) customers were "bucketed" in an amount in excess of $246,000.00. Additionally, R. J. Allen used $60,000.00 of other customers' money in its business which funds it was purportedly holding in trust for those customers.

Finally, the evidence shows that the defendants were operating a classic "boiler room" and even called it that among themselves. "Boiler room" activity consists essentially of offering to customers securities of certain issuers in large volume by means of an intensive selling campaign through numerous salesmen by telephone or direct mail, without regard to the suitability to the needs of the customer, in such a manner as to induce a hasty decision to buy the security being offered without disclosure of the material facts about the issuer. This is an apt description of the defendant's operation.

In summary, the evidence in this case describes a horrible fraud, one that has been vicious and brutal. It is difficult to imagine how anyone could contrive and execute a more diabolical scheme. It has effectively defrauded and cheated the customers of R. J. Allen who purchased IDR's, many of whom have been left destitute. Indeed, the proof of all of the fraud allegations contained in Count I of the Commission's Complaint has been conclusive and overwhelming with respect to each defendant, separately and collectively, particularly including the defendant Alexander.

In addition to the fraud allegations contained in Count I, the Commission, in Count II of its Complaint, alleged certain facts to support its prayer for certain ancillary relief. The record discloses that each of these allegations was likewise conclusively proved.

As noted above, the defendants for a period of approximately two years carried out their fraudulent scheme and design by means of evasions and deceit including failure to disclose that Allen and Alexander stood to benefit from their affiliation with at least one enterprise receiving the proceeds of the bond sales made through R. J. Allen. The defendants repeatedly refused to execute transactions ordered by customers while receiving and spending the customers' funds for their own benefit. The benefits derived by the defendants by virtue of their fraudulent scheme have been retained by them.

The deceitful and wrongful conduct of the defendants set out above is so pervasive that it is imperative that action be taken to determine the full extent of their unlawful activities and to prevent the defendants from disposing of assets or wasting them. Further, the continued management and administration of the affairs of R. J. Allen without some type intervention is almost certain to result in additional and continuing viola-

tions of the federal securities laws and further misuse of investors' funds and diminution of assets. For example, the evidence shows that during the period from at least December 1973 through July 1974, R. J. Allen was insolvent, yet it continued accepting customers' funds and, during the period from March 1974 through July 1974, the firm converted customers' funds to its own use in amounts exceeding $231,000. Such gross misuse of customers' funds clearly demonstrates the defendants' total neglect of their obligations to their customers and the investing public.

## REMEDIES

■ The Supreme Court has consistently stated that the federal securities laws, "enacted for the purpose of avoiding frauds" must be construed "not technically and restrictively, but flexibly to effectuate [their] remedial purposes." Securities and Exchange Commission v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 195, 84 S.Ct. 275, 285, 11 L. Ed.2d 237 (1963) (Investment Advisers Act); *accord,* Tcherepnin v. Knight, 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967) (Securities Exchange Act); Affiliated Ute Citizens v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972) (Securities Exchange Act); *see,* Securities and Exchange Commission v. C. M. Joiner Leasing Corp., 320 U.S. 344, 353–354, 64 S.Ct. 120, 88 L.Ed. 88 (1943) (Securities Act).

The Commission in this action is seeking not only injunctive relief as specifically provided for by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(e) of the Exchange Act [15 U.S.C. § 78u(e)] but also certain ancillary remedies under the general equity powers of this Court. In viewing this request for additional relief, the Court is mindful of the Supreme Court mandate set out above and concludes that remedies of the type sought herein are appropriate in an action brought by the Commission to effectuate the remedial purposes of these Acts for the protection of the investing public. This Court, in issuing the Temporary Restraining Order granted certain ancillary remedies for that purpose and those provisions of the Temporary Restraining Order are strengthened and made more definite hereby.

## I

■ Under Section 20(b) of the Securities Act, [15 U.S.C. § 77t(b)] and Section 21(e) of the Exchange Act, [15 U.S.C. § 78u(e)], the test laid down for injunctive relief is whether or not "a proper showing" of need has been made by the Commission. S.E.C. v. Bennett & Co., 207 F.Supp. 919 (D.N.J.1962); S. E.C. v. Broadwall Securities, Inc., 240 F.Supp. 962 (S.D.N.Y., 1965). This standard is quite different from the common law equity basis for an injunction and no showing of irreparable injury is required. S.E.C. v. General Securities Co., 216 F.Supp. 350, 352 (S.D.N. Y., 1963); S.E.C. v. Broadwall Securities, Inc., *supra,* 240 F.Supp. at 967. When a federal court exercises its discretion in issuing a statutory injunction, it is guided by the primary objectives of the statute involved, using public interest standards as opposed to private litigation requirements, Hecht Co. v. Bowles, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754 (1944). The evidence adduced at the hearing makes such a "proper showing" and clearly demonstrates that all the defendants have been engaged and are engaged in a course of conduct grossly violative of the antifraud provisions of the securities acts.

The heart of the federal securities laws enacted to insure, among other things, fair-dealing between sellers and purchasers of securities is the antifraud provisions embodied in Section 17(a) of the Securities Act of 1933 [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 [15 U.S.C. § 78j(b)].

■■ These sections make unlawful not only material misstatements or omissions to state material facts but also the use of any device, scheme or artifice to defraud and any act, practice or course

of business which operates as a fraud upon any person. False representations, or representations that are false and misleading by virtue of the fact that necessary qualifications or explanation were omitted, have consistently been held by the courts and the Commission to constitute fraudulent activity violative of the anti-fraud provisions of the securities acts, S.E.C. v. Charles A. Morris & Associates, Inc., et al., *supra*; Charles Hughes & Co. v. S.E.C, 139 F.2d 434 (2d Cir., 1943); Norris and Hirshberg v. S.E.C., 85 U.S.App.D.C. 268, 177 F.2d 228 (1949); Charles E. Bailey & Co., 35 SEC 33 (1953).

Within the last decade Section 10(b) and Rule 10b–5—which is prominent among the rules adopted by the Commission pursuant to that Section—have developed into major tools for implementing Congress' broad purpose "to prevent inequitable and unfair practices" in securities transactions. Preamble, Securities Exchange Act of 1934, 48 Stat. 881. The Supreme Court has noted the importance of Section 10(b) and Rule 10b–5 and the public's reliance upon them in Securities and Exchange Commission v. National Securities, Inc., 393 U.S. 453, 465, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969), where the Court observed that these provisions "may well be the most litigated provisions in the federal securities laws . . . ."

The Court of Appeals for the Fifth Circuit has noted how comprehensive Section 10(b) is in Rekant v. Desser, 425 F.2d 872, 880, n. 15 (1970):

"It would have been difficult to frame the authority to prescribe regulations, in broader terms. . . . We see no reason to go beyond the plain meaning of the word 'any,' indicating that the use of manipulative or deceptive devices or contrivance of whatever kind may be forbidden . . . Ellis v. Carter, 9 Cir., 1961, 291 F.2d 270, 272–274."

*See, also,* McClure v. Borne Chemical Co., 292 F.2d 824, 834, (3d Cir., 1960) cert. denied, 368 U.S. 939, 82 S.Ct. 382, 7 L.Ed.2d 339 (1961). Similarly, the broad language of Rule 10b–5:

"demonstrates that the SEC sought by the Rule . . . fully to implement the Congressional purpose and objectives underlying Section 10(b). See Securities Exchange Act of 1934, Release No. 3230 (May 21, 1942); 10 SEC Ann.Rep. 56–7 (1944); 8 SEC Ann.Rep. 10 (1942)."

Securities and Exchange Commission v. Texas Gulf Sulphur Co., 401 F.2d 833, 860 (2d Cir., 1968) (en banc), certiorari denied, Coates v. Securities and Exchange Commission, 394 U.S. 976, 89 S. Ct. 1454, 22 L.Ed.2d 756 (1969). Moreover, Rule 10b–5(3) explicitly prohibits *"any* act, practice or course of business which operates or would operate as a fraud or deceit upon *any* person . . ." (emphasis added). The Supreme Court recently observed: "These proscriptions, by statute and rule, are broad and, by repeated use of the word 'any,' are obviously meant to be inclusive." Affiliated Ute Citizens v. United States, *supra.*

### A. *Misrepresentations and Omissions of Material Facts*

In connection with the offers and sales of the securities discussed above, defendant R. J. Allen and defendants Allen, Alexander, Diaz and Preston made misrepresentations of material facts concerning the securities sold by R. J. Allen, the issuers of the securities and other matters.

The facts enumerated above, both those which were the subjects of misrepresentations and those which the defendants failed to disclose, constituted the kind of information to which a reasonable investor would attach significance in the making of his investment decision. Thus, these facts were "material" within the meaning of Section 17(a) of the Securities Act of 1933 [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 [15 U.S.C. § 78j(b)] and Rule 10b–5, Securities and Exchange Commission v. Texas Gulf Sulphur Co., *supra*, at 849. Ac-

cordingly, these misrepresentations and omissions constituted violations of the anti-fraud provisions enumerated above.

### B. *Fraudulent Course of Conduct*

■■■ In addition to the illegal conduct set forth above which permeated the entire operation, the defendants engaged in the practice known as "bucketing" whereby a broker accepts a customer's funds for the purchase of a security and deliberately withholds execution of the order anticipating a decline in the market or other eventuality allowing the broker to retain some or all of the purchase price paid by the customer. Such activity is inherently fraudulent and a violation of the anti-fraud provision of the securities laws and alone warrants the entry of relief sought herein, S.E.C. v. Nationwide Investment Corp. et al., (D.C.C.Cal.1970), CCH Fed.Sec.L.Rept., '69–'70 Trans. Binder, ¶ 92,723. Additionally, the practice of "switching", detailed above and the ever present promise of non-existent insurance constituted a course of conduct that operated as a fraud and deceit upon the customers of R. J. Allen purchasing IDR's, particularly in view of the unsophisticated nature of many of the investors and their reliance upon the ability and expertise of the defendants in advising them as to purportedly safe, liquid securities.

### C. *Liability for Fraudulent Activities*

■■ The corporate defendant is responsible for the unlawful acts done in its name by its agents and principals. Armstrong, Jones & Co. v. Securities and Exchange Commission, 421 F.2d 359, 362 (6 Cir., 1970), cert. denied, 398 U.S. 958, 90 S.Ct. 2172, 26 L.Ed.2d 543 (1961).

■■ The top management officials, Allen and Alexander, are also subject to sanctions, not only for the violations they directly committed but also as aiders and abettors of the fraudulent conduct in which the salesmen engaged. Brennan v. Midwestern Life Insurance Co., 286 F.Supp. 702 (N.D.Ind.1968), aff'd 417 F.2d 147 (7th Cir. 1969), cert.

denied, 397 U.S. 989, 90 S.Ct. 1122, 25 L.Ed.2d 397 (1970). The defendants Allen and Alexander set up, supervised, and had complete control over all the operations of defendant R. J. Allen. They were aware of the sales practices involved and in fact, Diaz, under their control, trained new sales personnel in the fraudulent techniques employed by the firm. Both Allen and Alexander stood to benefit by the successful bond offerings in which they had a direct monetary interest. A dealer in securities warrants to the public that it will deal with it competently and in good faith. Charles Hughes and Co. v. Securities and Exchange Commission, *supra*. R. J. Allen and its principals made no effort to upheld this public trust. *See*, S. E. C. v. Charles A. Morris & Associates, Inc., et al., *supra*.

■■ The Commission has proved that the defendants have thwarted the policy of the securities acts by engaging in proscribed activities. The question for the Court, in considering the requested injunction, is whether there is a reasonable expectation that the defendants' illegal activities will be repeated. United States v. W. T. Grant Co., 345 U.S. 629, 634, 73 S.Ct. 894, 97 L.Ed. 1303 (1953); S. E. C. v. Culpepper, 270 F.2d 241 at 249 (2d Cir. 1959); S. E. C. v. Continental Tobacco Co. of South Carolina, 463 F.2d 137, 162 (5th Cir. 1972). The defendants' illegal past conduct has been set out above in detail. Illegal past conduct gives rise to the inference that there is a reasonable likelihood of future violations. S. E. C. v. Keller Corp., 323 F.2d 397, 402 (C.A. 7, 1963); S. E. C. v. Charles A. Morris & Associates, *supra*; S. E. C. v. Commercial Investment and Development Corp. (S.D.Fla., 1974), 373 F.Supp. 1153. It is perfectly clear that unless this Court enjoins the defendants, the violations shown will be continued. "[T]he Commission should not be required to keep these [defendants] under surveillance and to bring a subsequent injunction action if they commence again to sell 'tainted stock'." S. E. C. v. Culpepper, *supra*, 270 F.2d at 251. The

egregious conduct of the defendants casts doubt on any promise of future compliance with the securities laws, S. E. C. v. Kamen & Co., 241 F.Supp. 430 (S.D.N.Y., 1963), and demonstrates that a broad injunction is essential if the Congressional purpose reflected in the securities laws is to be accomplished. As in S. E. C. v. Mono-Kearsarge Consol. Min. Co., 167 F.Supp. 248, 261 (D. C.Utah, 1958):

" . . . the Court may infer from a wanton or even careless willingness to take a chance on the legality of questionable transactions that a defendant is about to *similarly* violate the Act if afforded an opportunity to do so in the absence of an injunction . . . ." (Emphasis added.)

 Finally, it should be noted that the issuance of an injunction as prayed for will not injure the defendants but can only serve to protect the public. Therefore, the defendants, and each of them, singly and in concert, are hereby enjoined from further violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b–5 thereunder, in connection with the offer, sale, or purchase of any security.

## II

The Commission, in its prayer for relief also seeks the appointment of a receiver for R. J. Allen. The propriety of appointing a receiver in an injunctive action brought by the Commission to enforce the federal securities laws is well settled. *See, e. g.*, Securities and Exchange Commission v. Bowler, 427 F.2d 190 (4th Cir., 1970); Securities and Exchange Commission v. Keller Corporation, 323 F.2d 397 (7th Cir., 1963); Securities and Exchange Commission v. Allen F. Hughes, Inc., [1971–1972 Transfer Binder] CCH Fed.Sec.L.Rep. 79,344 (2d Cir., Nos. 71–1118, 71–1196, April 21, 1972); Securities and Exchange Commission v. Charles Plohn & Co., 433 F.2d 376 (2d Cir., 1970); In re Federal Shopping Way, Inc., 433 F.2d 144 (9th Cir., 1970); Los Angeles Trust Deed and Mortgage Exchange v. Securities and Exchange Commission, 285 F.2d 162 (9th Cir.), cert. denied, 366 U.S. 919, 81 S.Ct. 1095, 6 L.Ed.2d 241 (1961); Securities and Exchange Commission v. Gulf Intercontinental Finance Corp., Ltd., 223 F.Supp. 987 (S.D.Fla. 1963).

 Whether a receiver shall be appointed is, of course, a matter within the sound discretion of this Court. But in circumstances of egregious fraud where the interests of public investors are in substantial jeopardy, it has been recognized that the appointment of a receiver is necessary "[t]o prevent 'diversion or waste of assets to the detriment of those for whose benefit, in some measure, the injunction action is brought' . . . ." Securities and Exchange Commission v. Capital Counsellors, Inc., 332 F.Supp. 291, 304, (S.D.N.Y., 1971). In that case, there was no question of corporate insolvency or mismanagement. The Court appointed a receiver solely to protect the interests of those who were induced to invest in the defendants' scheme. *See, also*, Securities and Exchange Commission v. Manor Nursing Centers, Inc., 2 Cir., 458 F.2d 1082, at 1105; Esbitt v. Dutch-American Mercantile Corp., 335 F.2d 141, 143 (2d Cir., 1964). In Securities and Exchange Commission v. Bowler, *supra*, the Court of Appeals for the Fourth Circuit, in reversing as an abuse of discretion the lower Court's refusal to appoint a receiver, stated, *supra*, 427 F.2d at 198:

"Defendants resist strongly the appointment of a receiver on the ground that the defendant corporations were not insolvent. The short answer is that the authorities cited do not limit the appointment of a receiver to cases where insolvency is shown. Rather, a receiver is permissible and appropriate where necessary to protect the public interest and where it is obvious, as here, that those who have inflected serious detriment in the past must be ousted."

*Accord,* Securities and Exchange Commission v. Keller Corporation, 323 F.2d

397, 403 (7th Cir., 1963). Where, as here, the defendant corporation is insolvent, has converted customer funds and its management has used the corporate vehicle to engage in serious violations of the securities laws, it is appropriate to appoint a receiver for the corporate defendant.

The appointment of David Hughes as temporary equity receiver under the Temporary Restraining Order previously issued by the Court is affirmed and he is reappointed as permanent equity receiver for R. J. Allen. The receiver shall post a bond in principal amount of $50,000 for the faithful performance of his duties. In connection with his duties, the receiver shall:

(1) take into his immediate custody, control and possession all assets and property of whatever kind and wherever situated belonging to or in the possession of R. J. Allen, including but not limited to all books and records of account and original entry, all funds, securities, property, premises, bank and trust accounts and all other assets;

(2) forthwith take and maintain the complete and exclusive control, possession, and custody of all the assets and property of R. J. Allen;

(3) have power and authority, in his discretion, to oust the present management and employees of R. J. Allen and to continue or discontinue the business operations of R. J. Allen;

(4) be authorized to receive and collect any and all sums of money due or owing to R. J. Allen in any manner whatsoever, whether the same are now due or shall hereafter become due and payable;

(5) establish and maintain a trust account for the receivership in the Southeast First National Bank, Miami, Florida, or such other bank as the Court by separate order may designate, for the deposit of all sums received by him as receiver;

(6) make periodic reports to the Court with copies to all counsel and defendant Preston on a monthly or more frequent basis;

(7) promptly ascertain the names and addresses of all investors who purchased IDR's from or through R. J. Allen during the period from May 1972 through October 1974, and supply to those persons or parties notices of his appointment and permit them to file with the Clerk of this Court, to the attention of the receiver, any claim which they desire to make, for participation in any fund that may be created for the purpose of restitution as hereinafter set forth without prejudice to any person to pursue such remedies as they may have for injuries they have suffered at the hands of the defendants. The notice shall require the claim to be filed with specificity and to be verified, and the notice shall provide a time no later than 60 days after the date of the notice within which these claims shall be filed with the Clerk of this Court.

Upon presentation of this Memorandum Opinion, any persons or other entity shall deliver to the receiver any and all properties of R. J. Allen, real or personal, in their possession or under their control. The receiver may petition the Court from time to time for the appointment of attorneys or accountants or for further instructions and clarifications of directions herein given or for orders defining the boundaries of his authority. Until further Order of this Court, R. J. Allen, its officers, directors, agents, employees, servants, attorneys, banks, successors, or assigns, or any other person acquiring knowledge of this Memorandum Opinion by notice or otherwise, are prohibited from directly or indirectly:

(a) dissipating, concealing or disposing of in any manner, any assets, choses in action or other property of R. J. Allen, and/or

(b) destroying, mutilating, concealing or altering or disposing of in any manner any of the books, records, documents, correspondence, brochures, manuals, obligations or other property of R. J. Allen.

## III

■ The Commission has sought, in its prayer for relief, an accounting by the defendants in order to aid the Court and its receiver in the proper exercise of their equitable functions in this matter. Such an ancillary remedy in aid of this Court's equity powers is clearly proper in cases such as the instant one. *See, e. g.,* S. E. C. v. Manor Nursing Centers, Inc., 458 F.2d 1082 (2d Cir., 1972). Therefore, an accounting shall be made. The defendants Diaz and Preston shall account within 30 days of the date of this Order to the receiver all monies or property received by them, directly or indirectly, in connection with their participation in the sales of IDR's in the form of compensation, draws, commissions or otherwise.

The receiver shall promptly proceed to establish an inventory of all papers, effects and assets which have heretofore come into his possession and thereafter proceed to conduct an accounting, which shall be filed with the Court, disclosing all of the material necessary for the Court to deal with the various claims filed by investors. This accounting must show the sums which have been received by the defendants as a result of transactions between them and those who invested in IDR's through R. J. Allen, particularly disclosing the status of the accounts between the defendant corporation and those investors who file claims.

## IV

A prayer has been made by the Commission for disgorgement. The word "disgorgement" appears to be a term of modern vintage utilized in connection with Commission suits seeking to deprive the defendants of the gains from their wrongful conduct as an ancillary remedy to fully effect the deterrent force that is essential to adequate enforcement of the federal securities laws. *See, e. g.,* Securities and Exchange Commission v. Manor Nursing Centers, Inc., *supra;* S. E. C. v. Texas Gulf Sulphur Co., 312 F.Supp. 77 at 92 (S.D.N.Y.

1970) aff'd 446 F.2d 1301 (2d Cir. 1971), cert. denied 404 U.S. 1005, 92 S. Ct. 561, 30 L.Ed.2d 558 (1971); Securities and Exchange Commission v. Golconda Mining Co., 327 F.Supp. 257 (S. D.N.Y., 1971); S. E. C. v. Shapiro, 494 F.2d 1301 (2d Cir., April 9, 1974).

■■ Although the late and eminent Judge Emett C. Choate did not use the word "disgorgement" in Securities and Exchange Commission v. Gulf Intercontinental Finance Corp., Ltd., *supra,* he did, in that case, in a factual situation somewhat like the one at Bar, provide for what he called recoupment and restitution. Restitution, like disgorgement, deprives a defendant of the gains from his wrongful conduct. Schine Chain Theatres, Inc. v. United States, 334 U.S. 110, 128, 68 S.Ct. 947, 92 L.Ed. 1245 (1948); *accord,* S.E.C. v. Texas Gulf Sulphur Co., 446 F.2d at 1308. The reparation of funds caused by the defalcation and fraud of these defendants is required by natural justice and is within the equity power of this Court. In dealing with plaintiff's prayer for disgorgement, this Court equates disgorgement with restitution and recoupment which are equity remedies of ancient origin. When congress entrusts to an equity court the enforcement of prohibitions contained in a regulatory enactment, it must be taken to have acted cognizant of the historic power of equity to provide complete relief in the light of statutory purposes. There is inherent in courts of equity a jurisdiction to give effect to the policy of the legislature. Mitchell v. DeMario Jewelry, 361 U.S. 288, 292, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960).

■ It is well established that Section 27 of the Exchange Act [15 U. S.C. § 78aa] confers general equity powers upon the district courts. S. E. C. v. Texas Gulf Sulphur Co., 446 F.2d 1301, 1307 (2d Cir., 1971); S. E. C. v. S & P National Corporation, 360 F.2d 741, 750 (2d Cir., 1966); Lankenau v. Coggeshall & Hicks, 350 F.2d 61, 63 (2d Cir., 1965). Once the equity jurisdiction of the district court has been prop-

erly invoked by a showing of a securities law violation, the Court possesses the necessary power to fashion an appropriate remedy. Thus, while the Exchange Act does not specifically authorize the ancillary relief sought in this case, "[i]t is for the federal courts 'to adjust their remedies so as to grant the necessary relief' where federally secured rights are invaded." J. I. Case Co. v. Borak, 377 U.S. 426, 433, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964). *Accord,* Deckert v. Independence Corporation, 311 U.S. 282, 288, 61 S.Ct. 229, 85 L.Ed. 189 (1940). The effective enforcement of the federal securities laws requires that the Commission be able to make violation unprofitable. The deterrent effect of a Commission enforcement action would be greatly undermined if securities laws violators were not required to disgorge illicit gains. As Judge Waterman said in S. E. C. v. Texas Gulf Sulphur Co., *supra,* 446 F.2d at 1308: "It would severely defeat the purposes of the Act if a violator of Rule 10b–5 were allowed to retain the profits from his violation." *Accord,* S. E. C. v. Golconda Mining Co., 327 F.Supp. 257, 259 (S.D. N.Y.1971).

 The Court concludes that in cases such as this, restitution, or "disgorgement", is a proper remedy to effectuate the remedial purposes Congress intended in enacting the federal securities laws.

The defendant corporation and the defendants Allen and Alexander, whose activities were inextricably interwoven with that of the corporation, are jointly and severally liable and are required to jointly restore to the receiver the full amount received from all of those investors who purchased IDR's as shown by the accounting to be filed by the receiver. The defendants Diaz and Preston shall restore the aggregate sum received by each, as shown by the above-noted ac-

counting to the receiver, as restitution or disgorgement.

## V

 The Commission has asked that a temporary trust be established over the assets of the defendants to aid in effecting the accounting and disgorgement granted above. It appears that such a trust is essential and vital to the preservation of the assets of the defendants so that a proper accounting, followed by restitution, may be made. The Court concludes that imposition of such a trust is necessary, in the exercise of its equity jurisdiction, to prevent waste and dissipation of assets available for restitution and disgorgement. This remedy has been approved where disgorgement was ordered in a suit brought by the Commission. S. E. C. v. Manor Nursing Centers, Inc., *supra.* Therefore, a trust is impressed over the assets of the defendants, and each of them, and they are, until further Order of this Court, prohibited, and any of their officers, agents, employees, servants, or attorneys, or any other person in active concert or participation with them who receives actual notice of this Memorandum Opinion by personal service or otherwise, are prohibited, from directly or indirectly

(a) dissipating, concealing or disposing of in any manner, any assets, choses in action or other property of the defendants herein; and

(b) destroying, mutilating, concealing or altering or disposing of in any manner, any of the books, records, documents, correspondence, brochures, manuals, obligations or other property of the defendants herein.

The Court retains jurisdiction of this matter and may modify the trust features upon a proper showing at any time hereafter. A final order will issue at an appropriate date.