UNITED STATES of America, Plaintiff,

v.

Richard CANNISTRARO, Defendant.

Crim. No. 87–193.

United States District Court,
D. New Jersey.

Aug. 18, 1988.

---

Robert P. Warren, Asst. U.S. Atty., Newark, N.J., for Government.

Bruce M. Merrill, Fleming, Merrill, Roth & Russell, Newark, N.J., for defendant.

Barry R. Goldsmith, Deputy Chief Litigation Counsel, Div. of Enforcement, U.S. S.E.C., Washington, D.C., for the S.E.C., amicus curiae.

Thomas L. Morrissey, Carpenter, Bennett & Morrissey, Newark, N.J., Trustee.

## OPINION

LECHNER, District Judge.

Richard S. Cannistraro ("Cannistraro") pled guilty to a nine count indictment including conspiracy to commit securities fraud, securities fraud, mail fraud, and obstruction of justice. He was sentenced to a term of imprisonment totalling eight years and to pay fines and restitution totalling approximately $725,000. Several motions are before the court: the motion of the United States seeking a turn over order pursuant to a writ of execution issued for money and assets which were placed with the court in connection with Cannistraro's bail; Cannistraro's motion for the return of money and assets which he deposited with the court in connection with his bail; and Cannistraro's motion challenging his sentence.[1]

---

1. In addition, the Securities and Exchange Commission ("SEC") moved to appear as *amicus curiae* "for the purpose of insuring that monies illegally obtained by defendant ... be preserved for the benefit of injured investors." No opposition to this motion has been filed; the SEC's motion to appear *amicus curiae* is granted.

The SEC is also proceeding in a civil action related to the securities fraud involved in this case. *SEC v. Monarch Funding Corp., et al.,* No. 85-7072 (S.D.N.Y.) (L.B.S.). The SEC moved in that case for a preliminary injunction against Cannistraro prohibiting him from future violations of the securities laws and for a freeze of

Cannistraro's assets which were originally posted with this court for bail purposes. On July 14, 1988, United States District Judge Leonard B. Sand entered the preliminary injunction prohibiting Cannistraro from violating the securities laws, and ordered that in the event Cannistraro's assets or monies posted with this court were ordered to be returned to him, the Clerk of this court was ordered to retain assets or monies of a value of $394,847. That is the amount of restitution which was ordered as part of Cannistraro's sentence in this case.

The SEC had requested an adjournment of the disposition of these motions pending the out-

## FACTS

On May 15, 1987, United States Magistrate Ronald J. Hedges of the District of New Jersey issued an arrest warrant for Cannistraro based on a criminal complaint alleging a conspiracy to commit securities fraud. On that day Cannistraro was arrested in California. On May 18, 1987, Cannistraro made his initial appearance before United States Magistrate Brown in the Central District of California. Magistrate Brown allowed the pretrial release of Cannistraro; bail was satisfied with $75,000 in cash and a $50,000 appearance bond secured by defendant's title to his 1985 928S Porsche automobile.

On May 28, 1987, a federal grand jury sitting in Newark, New Jersey returned a nine count indictment charging Cannistraro with conspiracy to violate the securities laws, securities fraud, mail fraud, interstate transportation of stolen property, and obstruction of justice. Specifically, the indictment alleged that between 1982 and 1983 Cannistraro entered into an arrangement with portfolio managers of mutual and bank funds whereby they agreed to assist him in manipulating the price of the securities of Liquidation Control, Inc. ("LCI") and Toxic Waste Containment, Inc. ("TWC"). According to the indictment, the portfolio managers agreed to buy large blocks of these stocks for their funds' accounts, in return for which Cannistraro agreed to establish "nominee" brokerage accounts for the fund managers to conceal their fundamental interest in the transactions. The indictment further alleged Cannistraro, who at the time was a securities analyst at Wood Gundy, Inc. ("Wood Gundy"), drafted a false and misleading Wood Gundy research investment report concerning TWC and distributed this report through the United States mails. Finally, the indictment alleged Cannistraro had provided money to a grand jury witness in an effort to have this witness lie under oath to the grand jury about the witness' stock nominee relationship with Cannistraro.

On June 12, 1987, Cannistraro was arraigned; he pled not guilty to the charges against him. Shortly before trial, however, on September 21, 1987, Cannistraro pled guilty to all nine counts of the indictment. There was no plea agreement with the Government.

On September 24, 1987, a hearing was held on the Government's motion for the detention of Cannistraro pending sentencing. After testimony from several witnesses was heard, Cannistraro was allowed to remain free on bail. In order to ensure Cannistraro's appearance for sentencing on November 2, 1987, his bail was increased by $450,000 and other conditions of release were imposed.[2] On September 25, 1987, Cannistraro executed a second appearance bond, and posted with the court various municipal bonds and certificates of deposit registered in his name which totalled approximately $455,000.[3] Cannistraro also filed with the court an appropriate document to transfer to the United States legal title of the assets he posted.

come of the motion for a freeze order in the civil proceeding. I granted the SEC's request. The motion in the civil proceeding was then adjourned upon Cannistraro's request. The SEC sent this court a copy of Judge Sand's order, which was received on August 2, 1988.

**2.** Significantly, Cannistraro did not object to the total dollar amount of the bail or the other conditions of release as excessive. In addition to a total bail amount of $575,000, the following conditions of release were imposed on Cannistraro: he was to report to Probation, in person, three times weekly; he was to call Probation daily; he was to have no contact with the stock market in any way; he was to have no contact with any witnesses or anyone else involved in this matter; he was not to possess a firearm or be in the company of anyone who did; and he was to be in his residence by 10:00 o'clock p.m. each night.

**3.** Cannistraro posted the following items with the court:

1. Home Federal Savings and Loan liquid certificate of deposit, Account # 12140021911, approximate value $124,278;

2. Central Federal Savings and Loan money market account # 322271096, approximate value $31,190.37;

3. Illinois Housing Development Bond, # AR711, valued at $100,000;

4. Intermountain Power Agency Bond, # R101391, valued at $100,000; and

5. South Carolina Public Service Authority Revenue Bond, # R3353, valued at $100,000.

On November 2, 1987, a hearing was held for the purpose of sentencing Cannistraro. In order to make the sentencing determination, a careful review was made of Cannistraro's lengthy sentencing memorandum submitted by his attorney (the "Memorandum") which described, presumably in a light most favorable to Cannistraro, the factual basis for his guilty pleas to all nine counts of the indictment.

The Memorandum discusses each of the counts to which Cannistraro pled guilty. In discussing count one, charging conspiracy to commit securities fraud, Cannistraro explains his relationship to the companies, LCI and TWC. Cannistraro was an officer and director of LCI and also owned 975,000 shares of LCI stock. Memorandum at 4. According to Cannistraro he was not an officer, director or insider of TWC. The Memorandum notes, however, that there were some common members of the LCI and TWC management teams and boards of directors. *Id.* at 5.

Cannistraro was a vice president and securities analyst at Wood Gundy. In the course of his duties he became acquainted with Bynum Vickory ("Vickory"), the portfolio manager of the Calvin Bullock Fund, and Bill Fritz ("Fritz"), the portfolio manager of the Marshall & Isley ("M & I") Fund. In separate conversations, Cannistraro told Vickory and Fritz that he was an officer of LCI and that it had just gone public; according to Cannistraro, the portfolio managers expressed some interest in buying LCI stock. In other conversations with the portfolio managers, Cannistraro told them that "TWC would be going public by Monarch Funding and that TWC could be a great success." *Id.* at 5–6.

According to Cannistraro, his

guilty plea to count one is based upon his mentioning the possibility of getting Vickory and Fritz, or friends of theirs, an allocation of a couple of thousand dollars in a future TWC offering. This served as an added inducement for their purchase of LCI and possibly TWC shares for their respective funds.

*Id.* at 6. Cannistraro further admits he aided Vickory and Fritz

in opening nominee accounts at Monarch by assisting in their obtaining new account forms, and he used his friendship with Leo Eisenberg, the president of Monarch, to obtain a $3000 allocation of TWC for Bill Fritz's nominee and a $1000 allocation of TWC for Bynum Vickory's nominee.

*Id.* at 7.

In discussing this count, the Memorandum indicates the M & I fund lost $124,375 in LCI and the Bullock fund lost $25,000 in LCI. *Id.* at 7, 13–14. The Memorandum also states that Cannistraro and his co-conspirators gained a total of $247,572 from their transactions in TWC and LCI stock. This total includes the nominee accounts in the names of Carl A. Key, Donna Lee Clarambeau, Edward Cannistraro, Mary Godano, Dennis Williams, and Harold Beyer. *Id.* at 10.

Counts two through six charged separate securities fraud offenses. The Memorandum states the basis for Cannistraro's guilty plea to count two was

his failure to disclose his partial beneficial ownership in the [shares of the] Mary Godano [nominee account]. As an officer and director of LCI, Cannistraro should have disclosed any additional shares in which he might have had a beneficial interest.

*Id.* at 17. The Memorandum explains Cannistraro assisted his father, Edward Cannistraro, in the opening of a nominee account in the name of Mary Godano through Monarch Funding. Cannistraro also asked Leo Eisenberg, the president of Monarch Funding, "to give an allocation in the initial public offering of LCI to ... Mary Godano." *Id.* at 15. Cannistraro had a partial beneficial interest in the Mary Godano account. *Id.*

The Memorandum indicates the basis for Cannistraro's guilty plea to count three was his failure to disclose the assistance he provided his father in opening an account at Monarch Funding and in obtaining an allocation in the initial public offering of LCI. *Id.* at 18. The death of Edward Cannistraro resulted in making Cannistraro

a partial beneficial owner of the LCI shares. *Id.* at 19.

With respect to count four, Cannistraro admits he arranged for Donna Lee Claranbeau ("Claranbeau") to receive $5000 for the use of her name in a nominee account which he opened at Monarch Funding, and for which he obtained "a $10,000 allocation of [TWC] in the initial public offering." *Id.* at 22. Cannistraro details further that he borrowed $10,000 in cash from Monarch Funding which he gave to Claranbeau and which she used to purchase 40,000 units of TWC securities. *Id.*

Cannistraro directed the trading in the Claranbeau account. The account earned a profit of approximately $50,000. *Id.* Cannistraro states he pled guilty to count four because he did not disclose the Claranbeau nominee account in his Wood Gundy report recommending TWC. *Id.* at 23.

Similarly, with respect to count five, Cannistraro admits he arranged with Carl Alan Key ("Key") to open a nominee account at Monarch Funding to purchase TWC securities. Cannistraro borrowed $10,000 in cash from Monarch Funding which he gave to Key, instructing him to write a check to Monarch Funding to pay for 40,000 TWC units in the initial public offering. *Id.* at 24. The Key account earned a profit of $4,695. *Id.* Cannistraro states he pled guilty to count five because he did not disclose the Key nominee account in his Wood Gundy report which recommended TWC. *Id.* at 25.

With respect to count six, Cannistraro states that on April 19, 1983 he received a telephone call from a reporter for Ground Floor Publications regarding TWC. Cannistraro answered the reporter's questions and sent him a copy of the Wood Gundy report on TWC. Cannistraro, however, failed to disclose that nominee accounts had previously owned and sold TWC shares or the previous arrangements with the M & I Fund and the Calvin Bullock Fund. Cannistraro states his guilty plea to count six is based on this nondisclosure. *Id.* at 26.

The Memorandum indicates Cannistraro pled guilty to counts seven and eight, transporting fraudulent monies in interstate commerce and mail fraud, because of the doctrine that all members of a conspiracy and responsible for the overt acts of coconspirators. *Id.* at 30–31. Cannistraro concedes that these offenses were committed in connection with the conspiracy charged in count one to which he pled guilty. *Id.*

Finally, the Memorandum sets forth Cannistraro's version of the facts underlying his guilty plea to count nine for obstruction of justice. Cannistraro states he agreed to pay Key's legal fees incurred in any investigations of the nominee account. *Id.* at 31. According to Cannistraro, he gave Key approximately $10,000 in cash for legal fees. Cannistraro states Key told him that he had received a subpoena and that he was going to talk with government officials. According to Cannistraro,

> he and Key then discussed the events leading up to the purchase of TWC stock and in discussing the scenario misstated a few facts in order to minimize Cannistraro's role in the Key account.

*Id.* at 32.

In light of the sophistication and the potential of Cannistraro's fraudulent schemes, his attempt to obstruct justice, and considering all factors relevant to the sentencing determination, Cannistraro was sentenced to a term of imprisonment totalling eight years, followed by five years of probation, fines totalling $330,000, restitution in the amount of $394,847 and a special assessment of $50.[4]

---

4. More specifically, Cannistraro was sentenced as follows:
  (1) Count 1 (conspiracy to commit securities fraud): Five years and a fine of $10,000.
  (2) Counts 2–6 (securities fraud): Five years and a fine of $10,000 on each count. The term sentences are to run concurrently with each other and with the term sentence on count 1.

  (3) Count 7 (transporting fraudulent monies in interstate commerce): Three years and a fine of $10,000. The term sentence is to run consecutive to the term sentences imposed on counts 1 through 6.
  (4) Count 8 (mail fraud): Three years and a fine of $10,000. The term sentence is to run concurrently with the term sentence imposed

For purposes of the restitution order, although the Government's position was that Cannistraro's fraud on the investing public resulted in a loss of approximately three million dollars, the figures contained in Cannistraro's Memorandum were relied on in concluding that Cannistraro's illegal conduct resulted in a fraud on investors in the amount of $394,847. *See* Transcript of Sentencing Proceedings at 27, 49–50. This amount reflects the sum of the losses in LCI stock transactions of the Calvin Bullock and the M & I Fund ($25,000 and $124,375 respectively) and the profits gained by Cannistraro and his co-conspirators ($247,572). *Id.* at 27; *see also* Memorandum at 7, 10, 13–14.[5] At the sentencing hearing the addition of the profit and loss figures was reviewed with Cannistraro's trial attorney, David O'Connor ("O'Connor"). O'Connor responded: "I accept that, your Honor...." Sentencing Transcript at 27. O'Connor continued: "Now I'm not going to argue, your Honor, because there is no question that losses can be added to the gains and make this case...." *Id.* at 28.

On November 2, 1987, the day of the sentencing hearing, a Judgment and Commitment Order was entered against Cannistraro for his total term sentence, fines and restitution. Cannistraro was immediately remanded to the custody of the Attorney General. *Id.* at 51.

On November 13, 1987, Cannistraro filed a notice of appeal to the Third Circuit. The notice was filed by two law firms: Fleming, Merrill, Roth & Russell (Cannistraro's present counsel), and Gersten, Savage, Kaplan & Zuckerman (Cannistraro's trial counsel). *See* Defendant's Ex. D.

On November 16, 1987, Cannistraro's present counsel by Bruce Merrill ("Merrill") contacted the clerk's office for the United States District Court in Trenton, New Jersey in an attempt to have Cannistraro's bail recognizances cancelled. Merrill states he was advised that pursuant to Local Rule 35C.1 of the General Rules of the District of New Jersey, the $75,000 cash posted by Cannistraro would not be returned but rather be applied toward the fines imposed on Cannistraro by the judgment of the court. Merrill Aff., ¶ 6.

On November 20, 1987, Barry R. Goldsmith ("Goldsmith"), Assistant Chief Litigation Counsel for the SEC, sent a letter to the court requesting an order freezing Cannistraro's assets which were posted for bail until a trustee was appointed, at which time assets with a value in accord with the restitution order would be turned over to the trustee. Copies of this letter were sent to the Government and to Cannistraro's trial counsel, O'Connor and Marvin Gersten, who are both members of the firm of Gersten, Savage, Kaplan & Zuckerman.

Without having received any objection from Cannistraro, his trial counsel or his present counsel, on December 1, 1987 I signed an order which provided that Cannistraro's assets which were posted for bail would remain in the court's control until the appointment of a trustee to ovesee a fund to recompense defrauded investors, at

on count 7, and consecutive to the term sentences imposed on counts 1 through 6.

(5) Count 9 (obstruction of justice): Five years and a fine of $250,000. The execution of the term sentence is suspended and defendant is to be placed on probation for a period of five years which will follow the term sentences and any parole with respect to counts 1 through 8.

As special conditions of probation Cannistraro is to (a) pay restitution in the amount of $394,847 under the supervision of an appointed trustee of a fund to be established by the SEC for the purpose of compensating investors defrauded by Cannistraro's criminal activities; (b) pay all fines; (c) have no connection in any way with securities; and (d) obtain psychiatric treatment.

Finally, Cannistraro was ordered to pay a special assessment of $50 on count 9.
*See* Sentencing Transcript at 49–50; Judgment and Commitment Order.

5. There appears to be either a typographical or a mathematical error in the Sentencing Transcript and in the Judgment and Commitment Order with respect to the amount of restitution ordered. While the transcript and the order indicate $394,847 as the amount of restitution, the total sum of $25,000, $124,375, and $247,572 is $396,947. Therefore, all previous orders of this court making reference to the restitution amount are hereby amended to read $396,947 instead of $394,847. However, for purposes of this opinion, the figure $394,847 will be used.

which time assets with a value of approximately $394,000 would be turned over to the trustee. The order was retroactive to November 2, 1987, the date when the Judgment and Commitment Order was entered against Cannistraro.

Merrill, Cannistraro's present counsel, states that he first became aware of the December 1, 1987 order on December 9, 1987 when Assistant United States Attorney ("A.U.S.A.") Robert Warren ("Warren") advised him of it. On that date, A.U.S.A. Warren sent Merrill a copy of the order.[6]

On January 29, 1988, A.U.S.A. Warren submitted to the court a proposed order regarding the appointment of a trustee to establish and oversee a fund to hold monies received pursuant to this court's restitution order. A copy of the letter and proposed order was sent to Merrill. *See* Merrill Aff., ¶ 9 and Ex. G. This proposed order was never signed.

On February 5, 1988, Merrill sent a letter to the court which he "submitted in opposition" to the proposed order for the appointment of a trustee to oversee the restitution fund. In this letter, Merrill objected for the first time to the December 1, 1987 order which froze Cannistraro's assets posted with the court, and asserted that Local Rule 35C.1 violates the Eighth Amendment. Although no motion was filed with the court, Merrill requested that the parties be allowed "a sufficient amount of time to fully develop and brief the issues raised in this letter, prior to entering the government's order." *See* Defendant's Ex. H.

On February 11, 1988, Goldsmith submitted to the court a revised proposed order for the appointment of a trustee. *See* Defendant's Ex. I. A copy of this corre-

spondence was sent to Merrill. *See* Merrill Aff., ¶ 11.

On February 12, 1988, A.U.S.A. Warren wrote to the court in response to Merrill's February 5, 1988 letter. *See* Defendant's Ex. J. On February 16, 1988, Merrill wrote to the court replying to A.U.S.A. Warren's letter and requesting a briefing schedule regarding the issues raised in the correspondence, although no motion had yet been filed with the court. *See* Defendant's Ex. K.

On February 26, 1988, the United States requested the court issue a writ of execution because Cannistraro had failed to pay promptly the restitution and fines. The writ was issued, commanding the United States Marshal to satisfy the criminal judgment against Cannistraro out of the personal property of Cannistraro as set forth in the affidavit of A.U.S.A. Janice Montana.[7] On February 26, 1988 the writ of execution was served by a Deputy United States Marshal on the Clerk of the Court in Trenton, New Jersey, thus effecting execution upon all monies and assets listed in the writ. *See* Montana Aff., ¶ 2.

On March 8, 1988, Goldsmith sent a letter to the court advising that the SEC had approved the appointment of Thomas L. Morrissey, Esq. ("Morrissey") of the Newark, New Jersey firm of Carpenter, Bennett & Morrissey to serve as trustee of the Cannistraro restitution fund; Goldsmith submitted a proposed order, providing for the appointment of Morrissey. A copy of this letter was sent to Merrill. *See* Defendant's Ex. L. On March 11, 1988, Merrill wrote to the court to oppose the proposed order; Merrill requested that the court delay considering the proposed order until the matter was resolved after Merrill filed a motion which Merrill indicated he was then

---

**6.** It appears the record was unclear as to who was representing Cannistraro at that time. In an apparent effort to clarify the record, on December 16, 1987 Cannistraro's trial counsel, through O'Connor, wrote to the Court of Appeals to advise the court that Cannistraro's trial counsel had not been retained for the appeal of the Cannistraro matter and therefore wished to have the firm's name removed from the case. A copy of this letter was sent to Merrill. Although

the importance of communicating this clarification to the Government is obvious, O'Connor did not send a copy of this correspondence to the United States Attorney's Office or the SEC. *See* Defendant's Ex.F.

**7.** The affidavit listed the assets and cash which Cannistraro had deposited with the court.

in the process of preparing. *See* Defendant's Ex. M.

On March 22, 1988, the proposed order was signed, appointing Morrissey as trustee to establish and oversee a fund which is to hold all monies received from Cannistraro pursuant to this court's restitution order. As indicated in the order, the purpose of the fund is to recompense investors for losses resulting from the stock manipulations in which Cannistraro participated. The order further provided that the trustee, Morrissey, was to take into his custody assets of Cannistraro with a current value of $394,847, which were to be obtained from the assets posted for bail.

· Now before the court is the motion by the United States for an order directing the Clerk of the Court to turn over to the United States Marshal pursuant to the writ of execution all assets of Cannistraro held by the Clerk and further directing that assets in the value of $394,847 shall be paid to the trustee of the restitution fund. Also before the court is Cannistraro's motion, filed on March 28, 1988, for the return of the assets and cash he posted for bail. Cannistraro challenges Local Rule 35C.1, this court's orders of December 1, 1987 and March 22, 1988, as well as the writ of execution, dated February 26, 1988. In addition, on April 5, 1988 Cannistraro filed a motion, pursuant to Fed.R.Crim.P. 35, challenging the terms of his sentence and the manner in which the sentence was imposed.[8] For the reasons which follow, the Government's motion for a turn over order is granted; Cannistraro's motions for the return of the bail money and to modify his sentence are denied.

## DISCUSSION

### I. MOTIONS CONCERNING BAIL MONIES

In his motion seeking the return of the assets which were posted with the court,

Cannistraro challenges: (1) Local Rule 35 C.1, (2) this court's order of December 1, 1987 freezing Cannistraro's assets with the court, (3) this court's order of March 22, 1988 appointing a trustee to establish and manage a fund for the purpose of recompensing defrauded investors, and (4) the government's efforts to pursue its civil remedies to enforce the criminal judgment entered against Cannistraro. Cannistraro supports his challenges with three arguments: (a) that the local rule and this court's orders regarding the assets he posted for bail in effect impose a condition on his bail which is violative of the Eighth Amendment's prohibition against excessive bail; (b) that his procedural due process rights have been violated by the actions taken in connection with the property which he placed with this court; and (c) that the government is improperly pursuing its legal remedies to enforce this court's judgment against Cannistraro because his fines and restitution are assertedly not due and owing at this time.

### A. *Cannistraro's Eighth Amendment Challenges*

Cannistraro challenges Local Court Rule 35C.1 and this court's orders freezing his assets and appointing a trustee for restitution purposes; Cannistraro argues the Local Rule and the court's orders in effect impose a condition on his bail which violate the Eighth Amendment's prohibition against excessive bail. Cannistraro challenges Local Rule 35C.1 because his bail recognizances were not cancelled by the Clerk's Office as a result of the Local Rule's provision that if a sentence includes fines, such fines shall constitute a lien in favor of the United States on the cash deposited with the court.[9] Cannistraro also

8. The Rule 35 motion was adjourned pursuant to a request from Cannistraro's counsel. The brief in support of the motion was received on May 16, 1988, and oral argument was heard on May 27, 1988. *See supra* note 1, with regard to the timing of the disposition of these motions.

9. Local Rule 35C.1 provides:
   C. Refund of Bond Monies

1. Where a defendant's bond is secured by depositing cash with the Clerk pursuant to subsection A of this Rule, the monies shall be refunded when the conditions of the bond have been performed, the defendant has been discharged from all obligations thereon, and the recognizance bond has been duly cancelled of record. If the sentence includes a

challenges this court's order of December 1, 1987, made retroactive to November 2, 1987, which froze the assets which were posted for bail with the court pending the appointment of a trustee, at which time assets with a value of approximately $394,000 would be turned over to the trustee for restitution. Cannistraro also challenges this court's order of March 22, 1988 appointing a trustee to establish and oversee a fund for restitution purposes.

The ancillary relief requested by the Government of freezing Cannistraro's assets and appointing a trustee to establish and oversee a fund to recompense defrauded investors is both within this court's inherent equitable powers and warranted by the circumstances of this case. District courts possess broad equitable powers to order ancillary relief in order to effectuate the purposes of the securities laws. *See SEC v. American Board of Trade, Inc.,* 830 F.2d 431, 438 (2d Cir.1987), *cert. denied,* — U.S. ——, 108 S.Ct. 1118, 99 L.Ed.2d 278 (1988); *SEC v. Investors Security Corp.,* 560 F.2d 561, 567 (3d Cir.

1977); *SEC v. General Refactories Co.,* 400 F.Supp. 1248, 1260 (D.D.C.1975); *SEC v. R.J. Allen & Assoc., Inc.,* 386 F.Supp. 866, 880 (S.D.Fla.1974). Restitution in cases involving fraud deprives a defendant of the gains from his wrongful conduct and "is required by natural justice." *See R.J. Allen,* 386 F.Supp. at 880. Courts have recognized that "[t]o effect this purpose, there may be circumstances where a district court should temporarily freeze defendants' assets to insure that they will be available to compensate public investors" who were victims of securities fraud. *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1106 (2d Cir.1972); *International Controls Corp. v. Vesco,* 490 F.2d 1334, 1347 (2d Cir.), *cert. denied,* 417 U.S. 932, 94 S.Ct. 2644, 41 L.Ed.2d 236 (1974).[10]

For example, in *American Board of Trade,* the Second Circuit affirmed the district court's freeze of certain personal assets, because the SEC had offered substantial evidence that the money was owed, and because there was a clear danger that the assets would have been substantially depleted in the absence of a freeze. *Ameri-*

---

fine or costs, however, any such fine or costs shall constitute a lien in favor of the United States on the amount deposited to secure the bond. No such lien shall attach when someone other than the defendant has deposited the cash and the refund is directed to someone other than the defendant.
Cannistraro does not challenge Local Rules 35A.2 and 35B.8 which provide:
A. Deposit in Lieu of Surety
\* \* \* \* \* \*
2. If such a deposit in a criminal proceeding is not forfeited for default upon the appearance bond and was made by the party required to give security, or is shown to the Court to be his property though deposited in another name, it may be applied successively to the satisfaction of: (a) pecuniary conditions imposed upon the grant of probation; (b) claims of the United States in the proceeding, such as fines, costs or costs of prosecution under 28 U.S.C. § 1918; and (c) fees and expenses of the Marshal and Clerk. Upon exoneration of the appearance bond, the balance of the deposit then remaining shall be returned to the depositor.
\* \* \* \* \* \*
B. Bail
\* \* \* \* \* \*
8. Subject to subsection A.2 above, upon termination of a criminal proceeding and authorization from the United States Attorney,

the Clerk shall cancel the appearance bond and, where there has been a deposit of money, negotiable bonds, certificates of deposit or notes of the United States, shall prepare an order for submission to the Court for the return of the money, bonds, certificates of deposit or notes to the depositor thereof.

**10.** *See also SEC v. Vaskevitch,* 657 F.Supp. 312, 315 (S.D.N.Y.1987) (freezing assets of alleged violators of securites laws where alleged violators were attempting to move assets offshore); *SEC v. Musella,* 578 F.Supp. 425, 445 (S.D.N.Y. 1984) (freezing profits made in securities transactions to ensure any illegally obtained profits will remain available to satisfy judgment); *General Refactories,* 400 F.Supp. at 1260 (freeze of assets appropriate to assure compensation to victims of securities fraud); *cf. FTC v. H.N. Singer, Inc.,* 668 F.2d 1107, 1113 (9th Cir.1982) (court has equitable power to grant ancillary relief of freezing assets in case involving violations of laws enforced by the Federal Trade Commission ("FTC") where the FTC's objective was to obtain restitution of moneys fraudulently obtained); *FTC v. Southwest Sunsites, Inc.,* 665 F.2d 711, 718 (5th Cir.) (in case involving laws enforced by the FTC, court has inherent equitable power to order temporary ancillary relief preventing dissipation of assets or funds), *cert. denied,* 456 U.S. 973, 102 S.Ct. 2236, 72 L.Ed.2d 846 (1982).

*can Board of Trade*, 830 F.2d at 438–39. The court noted that the appellants' income was sufficient to meet their living expenses. *Id.* at 439. In affirming the district court's freeze order, the Second Circuit reasoned that in view of the facts and the fraudulent nature of the appellants' violations, the court could not be assured that the appellants would not waste their assets prior to refunding the public investors' money. *Id.* (quoting *Manor Nursing*, 458 F.2d at 1106).

■ In the same way, courts have the equitable power to establish a trust and appoint a trustee in order to effectuate the purposes of the securities laws, such as when it is necessary to prevent the dissipation of assets available for restitution. *American Board of Trade*, 830 F.2d at 436; *Investors Security Corp.*, 560 F.2d at 567; *Manor Nursing*, 458 F.2d at 1105; *R.J. Allen*, 386 F.Supp. at 881. For example, in *Manor Nursing*, the Second Circuit affirmed the district court's appointment of a trustee to receive funds, to distribute the funds to defrauded public investors, and to report to the court on the true state of affairs. *Manor Nursing*, 458 F.2d at 1105. The circuit court reasoned that the appointment of the trustee was necessary in order to implement the district court's order to refund the misappropriated money to de-

frauded public investors. The circuit court found reasonable the district court's conclusion that it could not rely on the appellants in that case to locate the defrauded investors and to refund the appropriate sums of money to them. *Id.*

■ Similarly, the particular circumstances of this case compelled the granting of the SEC's request for a temporary freeze of assets and an appointment of a trustee to oversee restitution efforts. Because of Cannistraro's prior fraudulent activities and his subsequent attempt to obstruct justice, "the court could not be assured that [Cannistraro] would not waste [his] assets prior to refunding public investors' money." *American Board of Trade*, 830 F.2d at 439; *Manor Nursing*, 458 F.2d at 1106. The temporary freeze of the assets was necessary to preserve the status quo. *See Manor Nursing*, 458 F.2d at 1106. Similarly, the appointment of a trustee was necessary to implement the court's order to recompense the defrauded investors. *Id.* at 1105; *see R.J. Allen*, 386 F.Supp. at 878, 881. The court's orders temporarily freezing defendant's assets and appointing a trustee to oversee restitution were within this court's equitable power and warranted by the facts of this case.[11]

---

11. Furthermore, the equitable concept of a constructive trust, although not the basis for the ancillary relief, supports the propriety of preserving Cannistraro's assets for restitution purposes. As explained by the Restatement of Restitution:

> Where the owner of property transfers it as a result of a mistake [fraud, duress or undue influence] of such a character that he is entitled to restitution, the transferee holds the property upon a constructive trust for him.

Restatement of Restitution § 163 (1936).

The courts impose the remedy of constructive trust where, rightfully or wrongfully, a party has obtained property that unjustly enriches him. Scott on Trusts, § 462.2 p. 3417 (3d ed. 1967). The primary purpose of the constructive trust is to prevent unjust enrichment of the transferees. The Restatement states:

> Where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it, a constructive trust arises.

Restatement of Restitution § 160 (1936).

The constructive trust principle has been applied in numerous contexts. *See Old Sec. Life Ins. Co. v. Continental Ill. Nat. Bank*, 740 F.2d 1384 (7th Cir.1984) (money fraudulently obtained by insurance company trustees was held in constructive trust for the benefit of the beneficiary); *Tenneco Oil v. Joiner*, 696 F.2d 768 (10th Cir.1982) (corporation's former employee who used leases and bonuses obtained while employed by the corporation for his own self gain, held proceeds from his activities in constructive trust for the corporation); *In re Lela & Co., Inc.*, 551 F.2d 399 (D.C.Cir.1977) (plaintiffs were entitled to enforce a constructive trust or an equitable lien upon their investments which were diverted by defendant from authorized real estate investment to an alternate, unauthorized purchase of land); *Stewart v. Harris Structural Steel Co., Inc.*, 198 N.J.Super. 255, 486 A.2d 1265 (App.Div.1984) (money earned by defendant corporation on money received from plaintiff in a voided sale of its voting common stock was held in constructive trust for plaintiff where retention of the money by defendant would unjustly enrich it); *cf. United States v.*

The essence of Cannistraro's Eighth Amendment challenge of this court's orders is his contention that this court's equitable power to fashion a remedy as necessary to effectuate the purposes of the securities laws prohibitions is limited in this case because at the time the court entered a monetary judgment against Cannistraro and ordered the asset freeze, Cannistraro's assets were in the court's custody where they had been originally placed for bail purposes. Cannistraro argues that the retention of his money and assets in order to satisfy the monetary aspect of his sentence places an additional condition on his bail which renders bail excessive.

The Eighth Amendment of the United States Constitution provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. Cannistraro asserts that bail is excessive, in violation of the Eighth Amendment, when it is set a figure higher than an amount reasonably calculated to ensure that an accused will stand trial and submit to sentencing if found guilty. *Stack v. Boyle,* 342 U.S. 1, 4–5, 72 S.Ct. 1, 3–4, 96 L.Ed. 3 (1951). Cannistraro argues the

only proper purpose of requiring the deposit of his assets and cash is to assure his appearance, and now that he has satisfied this condition, his bail money should be exonerated. *See* Fed.R.Crim.P. 46(f) ("When the condition of the bond has been satisfied ... the court shall exonerate the obligors and release any bail.").

The principal case upon which Cannistraro relies is *United States v. Rose,* 791 F.2d 1477 (11th Cir.1986). In *Rose* the defendant had posted a $24,000 cash appearance bond with the clerk of the district court. A condition was inserted into the face of the bond which stated:

> ... the defendant ... shall abide the final judgment and pay the fine imposed upon affirmance of the sentence of the appellate court.

*Id.* at 1479. Looking to Fifth Circuit precedent, the Eleventh Circuit held that

> the addition of any condition to an appearance bond to the effect that it shall be retained by the clerk to pay any fine that may subsequently be levied against the defendant after the criminal trial is over is for a purpose other than that for

*Uzzell,* 648 F.Supp. 1362, 1369 (D.D.C.1986) (in civil action relating to fraud of which defendants had been previously convicted, government's request of imposition of a constructive trust on defendants' property was denied as "unwarranted at this time" and stating the result sought would be obtained through a writ of execution to enforce the judgment).

In the present case, where Cannistraro has pled guilty to securities fraud, the equitable concept of a constructive trust could have been invoked to prevent unjust enrichment of Cannistraro and to insure compensation to his fraud victims. The proper imposition of a constructive trust, however, would necessitate a finding that the assets upon which the trust is imposed can be traced to the fraud, *re Country Junction, Inc.,* 41 B.R. 425, 432 (W.D.Tex.1984), *aff'd,* 798 F.2d 1410 (5th Cir.1986); *Alsco–Harvard Fraud Litigation,* 523 F.Supp. 790, 806–07 (D.D.C.1981).

In this case Cannistraro's history of employment and salaries does not seem congruous with Cannistraro's substantial assets. The inference could therefore be drawn that Cannistraro's substantial assets are traceable to his fraudulent schemes. Since 1975, when Cannistraro completed his college studies, he held the following jobs: consultant for Arthur Young and Company, earning $330 a week; statistician for

Morgan Guaranty Trust Company, earning $400 a week; investment banker for the National Association of Securities Dealers (salary records are unavailable); industrial specialist for Merrill, Lynch & Co., Inc., earning $1,000 a week; stock broker for Drexel Burnham Lambert, Inc. (salary unknown); director of investments—institutions sales for Mabon Nuget and Company, earning $75,000 a year; vice president of research analysis for Wood Gundy, earning $75,000 a year. After being terminated by Wood Gundy in 1983 Cannistraro was the president and chief stockholder of his own film company, Cinematronics. In 1985 Cannistraro resigned from his position as president but retained 1.2 million of restricted shares in the company. From 1985 he was a self-employed independent film producer and lived off his interest and dividends.

The endeavor of tracing Cannistraro's assets to his fraud, however, need not be undertaken here because the ancillary relief was not based on the constructive trust principle. The temporary relief ordered was within this court's broad equitable powers as it was necessary to prevent the dissipation of the assets available for restitution. In addition, in this case the Government has pursued enforcement of the monetary judgment in the usual manner, through a writ of execution.

which bail is required to be given under the Eighth Amendment. Such provision is therefore "excessive" and is in violation of the Constitution.

*Id.* at 1480.

Cannistraro also relies on a 1962 decision of Justice Douglas which involved, as a condition of bail, the requirement that the money deposited would be used to pay a fine. *See Cohen v. United States,* 82 S.Ct. 526, 7 L.Ed. 518 (1962) (not reported in United States Reports). In *Cohen,* Justice Douglas granted the defendant's request to remain free on bail pending his petition for certiorari "upon the posting of a good and sufficient bail bond in the amount of one hundred thousand dollars ($100,000)." The district court, however, added as a condition of bail that of the $100,000, $30,000 would be applicable to the payment of a fine imposed. *Cohen,* 82 S.Ct. at 527–28, 7 L.Ed. at 519. Justice Douglas struck this additional condition, finding that it would make bail " 'excessive' in the sense of the Eighth Amendment because it would be used to serve a purpose for which bail was not intended. The purpose of a bail bond is to insure that the accused will reappear at a given time...." *Id.* 82 S.Ct. at 528, 7 L.Ed.2d at 520.

■ *Rose* and *Cohen* are distinguisable from the situation presented here. In this case no condition was added to Cannistraro's appearance bond regarding his fines or restitution. Prior to Cannistraro's sentencing, his bail was set at an amount meant to reasonably assure his appearance in the proceedings. This was not excessive. Cannistraro was able to post sufficient security to procure his release, and, significantly, he did not object that the amount of his bail or the conditions of his bail were excessive in violation of the Eighth Amendment.[12] The operation of Local Rule 35C.1 and the order of this court freezing Cannistraro's assets were not a condition of his bail, and were not linked to the purpose of

bail. They came into operation after the purpose of bail had been satisfied; they were instead concerned with the preservation of Cannistraro's assets for the satisfaction of this court's monetary judgment entered against Cannistraro as part of his sentence.[13]

Cannistraro also relies on two cases from the Fifth Circuit in which the government sought payment of fines out of funds deposited with the court for bail. *See United States v. Powell,* 639 F.2d 224 (5th Cir. 1981); *United States v. Jones,* 607 F.2d 687 (5th Cir.1979). In *Powell,* the court affirmed the district court's denial of the government's motion for an order directing the clerk of the court to pay to the Treasurer of the United States a certain sum of the bail deposit in satisfaction of a fine. *Powell,* 639 F.2d at 225. The court explained that such an abbreviated fine collection procedure was improper, and indicated that the proper procedure was to collect the criminal judgment in the same way as a civil judgment under Fed.R.Civ.P. 69(a) through a writ of execution.

In *Jones,* the court reversed the district court which granted a motion by the government to use the defendant's bail money to pay an outstanding fine. *Jones,* 607 F.2d at 687. While the principal reason for the reversal was that the money which had been deposited with the court did not belong to the defendant, the court indicated that even if the money belonged to the defendant,

> no case has been cited by the Government to justify the direct application of that money to the fine, by court order, without pursuing whatever remedies might be available to the Government as creditor.

*Id.* at 688.

■ These cases are not controlling in the situation presented here. There is no contention made by Cannistraro that the

12. Although not reaching the issue, the court in *Rose* indicated a defendant may waive such an objection if it is not made at the time the bond is required. *See Rose,* 791 F.2d at 1480.

13. *Cf.* 18 U.S.C. § 3613(a) (Supp. IV 1986) (effective November 1, 1987) (providing that a fine imposed is a lien in favor of the United States upon all property belonging to the person fined, which arises at the time of the entry of the judgment).

assets deposited with the court do not belong to him. Also, the Government in this case has at no time sought an order directing the Clerk to pay defendant's fines out of the funds deposited without following the proper procedure under Fed.R.Civ.P. 69(a). The Government has acted properly in this matter in its efforts to collect upon this court's criminal judgment against Cannistraro which is enforceable in the same way as a civil judgment, through a writ of execution. In addition, as discussed above, the Government properly requested the temporary ancillary relief which was deemed necessary to prevent the dissipation of Cannistraro's assets.

Significantly, none of the cases cited by Cannistraro regarding the use of bail money involved facts similar to this case. All of the cases from the Eleventh and Fifth Circuits involved drug related offenses and the *Cohen* case involved a tax related offense. In this case Cannistraro has admitted to defrauding investors and attempting to obstruct a grand jury investigation. The nature of Cannistraro's offenses made restitution an appropriate and significant part of Cannistraro's sentence. Once a monetary judgment was entered against Cannistraro, the fraudulent nature of his offenses also compelled the invocation of this court's equitable powers to preserve Cannistraro's assets and to appoint a trustee so that the restitution aspect of his sentence could be implemented.

In conclusion, Local Rule 35C.1 and this court's orders did not violate the Eighth Amendment's proscription against excessive bail because their operation did not impose an additional condition on Cannistraro's bail. They only came into operation after the purpose of bail was realized—Cannistraro's appearance—and after Cannistraro was ordered to make restitution and pay fines as part of his sentence. Furthermore, their effect was only temporary, as needed to preserve Cannistraro's assets, while the Government properly proceeded in obtaining a writ of execution on the monies and assets which were deposited with the court. The Government is now entitled to have the assets turned over to it, with the appropriate restitution amount then being turned over to the trustee of the fund established to implement this court's restitution order.

## B. *Cannistraro's Due Process Complaints*

Cannistraro makes due process objections with respect to the operation of Local Rule 35C.1, this court's orders of December 1, 1987 and March 22, 1988, and the Government's efforts to pursue its remedies to enforce this court's judgment against Cannistraro. The Fifth Amendment of the United States Constitution provides: "No person shall be ... deprived of life, liberty, or property, without due process of law...." U.S. Const. amend. V. Cannistraro asserts he has been denied procedural due process in that he has not been afforded proper notice or an opportunity to be heard.

With respect to Local Rule 35C.1, Cannistraro argues he should have been informed at the time he first posted the $75,000 in California, that the money he was posting for bail would subsequently be subject to liens in favor of the Government. As mentioned, the lien which Rule 35C.1 imposes, however, was not a condition of defendant's bail; rather, it is a local rule designed to facilitate the enforcement of the judgment that was entered against Cannistraro after he admitted his crimes of securities fraud and obstruction of justice. In fact, the Local Rule's imposition of a lien only repeats what is mandated by statute:

> A fine imposed ... is a lien in favor of the United States upon all property belonging to the person fined. The lien arises at the time of the entry of the judgment and continues until the liability is satisfied, remitted, or set aside, or until it becomes unenforceable....

18 U.S.C. § 3613(a) (Supp.IV 1986) (effective November 1, 1987).[14]

---

**14.** Cannistraro has not made any claim that there is any *ex post facto* prohibition against applying section 3613(a) to him. The related statutory provision which was previously effective was 18 U.S.C. § 3565(a)(2) (Supp. IV 1986) (repealed as of November 1, 1987), which sim-

■ Moreover, Cannistraro's contention that he did not have notice must be rejected. The warrant for his arrest was issued by a magistrate sitting in Newark, New Jersey. Parties, especially when represented by counsel, should be considered to have constructive notice of the applicable local rules. Cannistraro made no objection when he posted the money in California, nor when it was transferred to the United States District Court in New Jersey. Moreover, Cannistraro made no objection when he posted in New Jersey bonds and certificates of deposit worth over $450,000 in order to satisfy his increased bail after he pled guilty. It cannot be maintained there is unfair surprise or any prejudice to Cannistraro by the imposition of liens on his property as a consequence of his sentence.

■ Cannistraro also complains his due process rights were violated by the Government's application for an order temporarily freezing his assets. Cannistraro complains he had neither notice nor an opportunity to be heard. Contrary to Cannistraro's assertions, however, copies of Goldsmith's November 20, 1987 letter requesting the temporary freeze were in fact sent to Cannistraro's attorneys, O'Connor and Gersten. These attorneys were Cannistraro's trial counsel and were also named in Cannistraro's notice of appeal. It was not until December 16, 1987 that O'Connor notified the Court of Appeals that his firm was no longer retained in the matter. Even then, while a copy of this letter was sent to Merrill, Cannistraro's present counsel, no copy was sent to the Government. *See supra* note 6; Defendant's Ex. F. It cannot be maintained the Government attempted to obtain the temporary freeze without notifying defendant's counsel.

Furthermore, while Merrill admits he was aware of this court's order as of December 9, 1987, no objection was made to the court on any ground until Merrill's February 5, 1988 letter. Moreover, Merrill did not file a motion challenging the freeze order until almost four months after the date he says he became aware of the freeze order. Thus, the facts do not reveal any transgression by the Government of Cannistraro's due process rights; rather, it appears that if there is any reason for delay in objecting to the order, it is due to the inattention of Cannistraro's attorneys.

■ Cannistraro further complains his due process rights were not safeguarded in the Government's submissions of proposed orders for the appointment of a trustee to oversee the Cannistraro restitution fund. Cannistraro objects to Goldsmith's indication in his February 11, 1988 letter to the court that he was enclosing a proposed order "in accordance with our discussion last week." Cannistraro complains that he was not privy to these discussions. This discussion was brief and had nothing to do with the merits of any issue with which the court is concerned in this matter. Furthermore, no contention is made that Cannistraro was not sent copies of the Government's correspondence to the court including the proposed orders. Also, there is no contention that Cannistraro did not have an opportunity to submit his arguments in opposition to the order. With such procedural safeguards, Cannistraro's objection to the Government's noting to the court that it would be submitting a proposed order is meritless.

Cannistraro further asserts the Government has acted improperly with respect to its efforts to enforce the court's judgment through a writ of execution. Cannistraro complains an affidavit was filed on February 17, 1988 seeking the writ of execution over defendant's monies and assets without notice to him, and that the writ was issued on February 26, 1988 without notice to him.

The Government, however, has acted properly in pursuing its legal remedies to enforce this court's criminal judgment against Cannistraro. The statutes concerning the enforcement of criminal judgments which impose fines or restitution provide that these monetary judgments entered in criminal cases may be enforced by execution against the property of the defendant in the same way as judgments in civil

---

ilarly provided that a judgment imposing a fine or penalty shall, under certain circumstances,

be a lien in favor of the United States upon all property of the defendant.

cases. *See* 18 U.S.C. § 3613(e) (Supp.IV 1986) (effective November 1, 1987) ("a judgment imposing a fine may be enforced by execution against the property of the person fined in like manner as judgments in civil cases"); [15] 18 U.S.C. § 3663(h) (Supp.IV 1986) (effective November 1, 1987) ("[a]n order of restitution may be enforced by the United States ... in the same manner as a judgment in a civil action"). [16]

The Government acted properly in seeking and obtaining a writ of execution to enforce the entire monetary judgment against Cannistraro under Fed.R.Civ.P. 69(a) [17] and 77(c), [18] and under N.J. Court Rule 4:59–1(a). [19] The rules do not require notice to a judgment debtor prior to the issuance of a writ of execution. [20] After the writ was issued, the Government served a copy of the writ on Cannistraro's present counsel. Finally, with notice to Cannistraro of the levy, the Government now moves for a turn over order. Cannistraro has had proper notice of the Government's efforts and has been afforded an

---

**15.** The related statutory provision which was previously effective was 18 U.S.C. § 3565(a)(1) (Supp. IV 1986) (repealed as of November 1, 1987), which similarly provided that judgments in criminal cases imposing a fine or penalty could be enforced by execution against the property of the defendant in the same way as judgments in civil cases. While Cannistraro refers to section 3565(a)(1) rather than to section 3613(e), Cannistraro does not make any claim that there would be any *ex post facto* prohibition against applying 3613(e) to his case. Throughout his briefs, Cannistraro's counsel refers interchangeably to the relevant statutory provisions which were effective prior to November 1, 1987 and those which became effective on that date. Cannistraro's counsel concedes that there is no *ex posto facto* prohibition against applying retrospectively laws which effect procedural changes and which do not disadvantage an offender by resulting in a greater punishment. *See* Cannistraro's Bail Motion Reply Brief at 4 n. 2 and at 7 n. 3 (citing *Paschal v. Wainwright*, 738 F.2d 1173, 1176 (11th Cir. 1984)).

**16.** As of November 1, 1987, section 3579 of title 18 was renumbered section 3663. The precise wording of section 3579(h) was amended by section 3663(h). Nevertheless, section 3579(h) similarly provided that an order of restitution may be enforced by the United States in the same way as judgments in civil cases. *See* 18 U.S.C. § 3579(h) (Supp. IV 1986) (renumbered section 3663 and amended as of November 1, 1987).

**17.** Rule 69(a) provides:
Process to enforce a judgment for the payment of money shall be a writ of execution, unless the court directs otherwise. The procedure on execution, in proceedings supplementary to and in aid of a judgment, and in proceedings on and in aid of execution shall be in accordance with the practice and procedure of the state in which the district court is held, existing at the time the remedy is sought, except that any statute of the United States governs to the extent that it is applicable.

Fed.R.Civ.P. 69(a).

**18.** Rule 77(c) provides:
All motions and applications in the clerk's office for issuing mesne process, for issuing final process to enforce and execute judgments, for entering defaults or judgments by default, and for other proceedings which do not require allowance or order of the court are grantable of course by the clerk; but the clerk's action may be suspended or altered or rescinded by the court upon cause shown. Fed.R.Civ.P. 77(c).

**19.** N.J. Court Rule 4:59–1(a) provides:
Process to enforce a judgment or order for the payment of money and process to collect costs allowed by a judgment or order, shall be a writ of execution, except if the court otherwise orders.... The writ may be issued either by the court or the clerk thereof.

**20.** With respect to notice, Fed.R.Civ.P. 77(d) provides:
Immediately upon the entry of an order or judgment the clerk shall serve a notice of the entry by mail in the manner provided for in Rule 5 upon each party who is not in default for failure to appear, and shall make a note in the docket of the mailing. Such mailing is sufficient notice for all purposes for which notice of the entry of an order is required by these rules; but any party may in addition serve a notice of such entry in the manner provided in Rule 5 for the service of papers.
Also with respect to notice, N.J. Court Rule 4:59–1(g) provides:
Notice to Debtor. Every court officer or other person levying on a debtor's property shall, on the day the levy is made, mail a notice to the person whose assets are to be levied on stating that a levy has been made and describing exemptions from levy and how such exemptions may be claimed. The notice ... shall be promptly filed by the levying officer with the clerk of the court.... No turnover of funds or sale of assets may be made, in any case, until 20 days after the date of the levy.

opportunity to be heard in opposition to the Government's motion. Cannistraro's contention that his due process rights are being ignored is groundless.

### C. *Time for Payment of Fines and Restitution*

Cannistraro's final argument in opposition to the Government's attempts to enforce this court's judgment is that his fines and restitution are not due and owing at this time. Cannistraro's contention, however, is flatly wrong.

When an person is sentenced to pay restitution or fines, these monetary penalties are due immediately unless the court orders otherwise. *See* 18 U.S.C. § 3572(d) (Supp.IV 1986) (effective November 1, 1987) ("Payment of a fine is due immediately unless the court, at the time of sentencing—(1) requires payment on a date certain; or (2) establishes an installment schedule, the specific terms of which shall be fixed by the court."); 18 U.S.C. § 3611 (Supp.IV 1986) (effective November 1, 1987) ("A person who has been sentenced to pay a fine ... shall pay the fine immediately, or by the time and method specified by the sentencing court...."); [21] 18 U.S.C. § 3663(f)(3) (1982 & Supp.IV 1986) (effective November 1, 1987) ("If not otherwise provided by the court under this subsection, restitution shall be made immediately."). [22]

Cannistraro argues that because the suspension of his term sentence on count nine was conditioned on his payment of his fines and restitution, his fines and restitution are not due until his probation period begins. Cannistraro's assertion is wrong.

It is proper to condition probation on the defendant's satisfaction of his monetary penalties; in fact, it is mandated by statute that if a defendant is placed on probation, any restitution ordered shall be a condition of probation. *See* 18 U.S.C. § 3663(g) (Supp.IV 1986) (effective November 1, 1987). [23] The fact that satisfaction of these penalties is a condition of Cannistraro's probation in no way indicates that they are not due and owing immediately, as provided by statute. A date certain for the payment of these penalties was not set; a schedule for payment in installments was not provided. Thus, Cannistraro's assertion that his fines and restitution were not due immediately, as required by the relevant statutes, is groundless.

In sum, the actions of the Government and the orders of this court in connection with the assets which Cannistraro originally posted for bail purposes have not violated Cannistraro's Eighth Amendment or due process rights. Accordingly, the Government's motion for a turn over order is granted; Cannistraro's motion for the return of his bail money is denied.

## II. RULE 35 MOTION

In this motion brought pursuant to Fed. R.Crim.P. 35, Cannistraro challenges his sentence in three ways. First, he argues that the sentence imposed, in particular the term sentence, is so disproportionate to the crime committed as to be violative of the Eighth Amendment of the United States Constitution. Second, Cannistraro asserts the sentencing procedure violated Fed.R. Crim.P. 32(c) in that the court did not either make findings with regard to controverted allegations or make a sufficiently explicit determination that it would not take into account such controverted matters when sentencing Cannistraro. Third, Cannistra-

---

**21.** Prior to November 1, 1987, the related provision which was effective was 18 U.S.C. § 3565(b) (Supp. IV 1986) (repealed as of November 1, 1987). Section 3565(b)(1) similarly provided that "[a] judgment imposing payment of a fine or penalty shall ... provide for immediate payment unless, in the interest of justice, the court specifies payment on a date certain or in installments...." *Id.*

**22.** As mentioned, prior to November 1, 1987 section 3663 was numbered section 3579. *See*

*supra* note 16. The redesignation and amendment did not change the language of subsection (f)(3). *See* 18 U.S.C. § 3579(f)(3) (1982); 18 U.S.C. § 3663(f)(3) (1982 & Supp. IV 1986).

**23.** Section 3663(g) amended its predecessor, 18 U.S.C. § 3579(g) (1982 & Supp. IV 1986), which was repealed as of November 1, 1987. Section 3579(g) also provided that if a defendant is placed on probation any restitution ordered shall be a condition of probation. *Id.*

ro challenges the order of restitution, asserting the court failed to properly assess either the amount of restitution owed to victims of Cannistraro's illegal acts or Cannistraro's ability to pay. Thus, Cannistraro seeks a reduction of the sentence imposed on November 2, 1987, a hearing so that findings of facts may be made with respect to controverted allegations of the Government, and a hearing to properly determine the amount of restitution and Cannistraro's ability to pay.

### A. *Proportionality Challenge*

Cannistraro argues the sentence imposed on him is so disproportionate to the crimes he committed that it violates the Eighth Amendment. Cannistraro does not express remorse over his offenses; rather he refers to his offenses as "technical violations of the Securities Exchange Act of 1934 and certain regulations." Cannistraro's Rule 35 Brief at 9. He contends his involvement in illegal activities "consisted of his non-disclosure of certain nominee accounts and not the manipulation of the securities market." *Id.* Thus, Cannistraro asserts that his sentence of eight years imprisonment, fines totalling $330,000 and restitution in the amount of $394,847 is disproportionate to the offenses he committed, as evidenced by the sentences received by other similarly situated defendants.

Trial courts have broad discretion in sentencing convicted criminals. *Solem v. Helm*, 463 U.S. 277, 290, 103 S.Ct. 3001, 3009–10, 77 L.Ed.2d 637 (1983). In "general ... once it is determined that a sentence is within the limitations set forth in the statute under which it is imposed, appellate review is at an end." *Dorszynski v. United States*, 418 U.S. 424, 431, 94 S.Ct. 3042, 3047, 41 L.Ed.2d 855 (1974).

Nevertheless, sentences must be consistent with the Eighth Amendment's declaration that "[e]xcessive bail shall not be required nor excessive fines imposed, nor cruel or unusual punishments inflicted." U.S. Const. amend. VIII. In *Solem*, the Supreme Court held "[t]he final clause [of the Eighth Amendment] prohibits not only barbaric punishment, but also sentences

that are disproportionate to the crime committed." *Solem*, 463 U.S. at 284, 103 S.Ct. at 3006. The Court recognized that appellate courts must accord legislatures and sentencing courts substantial deference. Thus, the role of the appellate court would not be to substitute its judgment for that of the sentencing court as to the appropriateness of a particular sentence, but only to decide whether the challenged sentence is within constitutional limits. *Id.* at 290 n. 16, 103 S.Ct. at 3009 n. 16.

■ The Court explained "the question cannot be considered in the abstract. Even one day in prison would be cruel and unusual punishment for the 'crime' of having a common cold." *Id.* at 287, 103 S.Ct. at 3008 (quoting *Robinson v. California*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962)). The Court provided guidance for a court's proportionality analysis under the Eighth Amendment. The analysis should be guided by objective criteria, including: (1) the gravity of the offense and the harshness of the penalty; (2) the sentences imposed on other criminals in the same jurisdiction; and (3) the sentences imposed for commission of the same crime in other jurisdictions. *Solem*, 463 U.S. at 292, 103 S.Ct. at 3010–11.

In an effort to show that his sentence is violative of the Eighth Amendment, Cannistraro focuses principally on the last two criteria set forth by the Court in *Solem*. First, Cannistraro points to examples of sentences imposed on other criminals within this district. In *Solem*, the court stated: "If [within the same jurisdiction] more serious crimes are subject to the same penalty, or to less serious penalties, that is some indication that the punishment at issue may be excessive." *Id.* at 291, 103 S.Ct. at 3010. In attempting to show that approximately the same penalty has been imposed for more serious crimes within this district, Cannistraro points to the ten year sentence imposed on the principal defendant after going to trial in the *Laser Arms* case. Cannistraro also points to the eight year sentence imposed by Judge Dickinson R. Debevoise on defendant Schulman in a case

where a fraud of a much larger dollar amount was shown at trial.

Cannistraro then points to sentences imposed on defendants in securities fraud cases outside this district, arguing these sentences are significantly less than Cannistraro's although the defendants were similarly situated. Cannistraro points to eight securities fraud cases and two tax fraud cases during which the greatest term sentence imposed was four years. Of the eight securities fraud defendants at least six had pled guilty. Most of those defendants received term sentences between one and two years. Defendant Dennis B. Levine received an actual term of two years after having cooperated with the Government and paid $11.6 million to the SEC. Defendant Ivan Boesky received a term sentence of three years after having cooperated with the Government and having paid $100 million to the SEC to settle civil charges.

In addition, Cannistraro points to the general statistics contained in the Presentence Report ("PSR") prepared by the probation office. These 1986 statistics show the average length of actual imprisonment for defendants convicted of fraud under the securities laws both nationally and in this district. The PSR indicates that nationally, the average term of actual incarceration was three years and eight months, while in the District of New Jersey, the average prison time served was two years and nine months.

■ Cannistraro's attempt to contrast his sentence with those of other defendants does not demonstrate that his sentence was so disproportionate to the crime as to violate the Eighth Amendment's proscription of cruel and unusual punishment. Cannistraro appears to be suggesting that his sentence is disproportionate because his term sentence is higher than the average time actually served by securities fraud defendants nationally and in New Jersey. The general statistics to which Cannistraro points, however, do not support such a conclusion. The statistics reflect the average prison time actually served by securities fraud defendants. It is likely that

these defendants received higher term sentences, but were released on parole before serving the complete term. Also the statistics indicate the average time served; thus, it is likely some defendants served shorter periods of incarceration and it is likely that some defendants served longer periods of incarceration. In addition, these statistics do not reflect what specific kinds of securities violations were involved, the magnitude of the offenses, or the particular circumstances of the defendants involved including the extent of cooperation with the Government.

Furthermore, Cannistraro attempts to show lack of proportionality by pointing to lower term sentences which have been imposed on other securities fraud defendants in New York. Cannistraro's effort, however, is not effective. Cannistraro's sentence differs from that of the defendants in which he points by at most a few years. In light of the crimes to which Cannistraro has pled guilty, subjecting him to a maximum penalty of fifty years, the difference to which Cannistraro points is insufficient to show significant lack of proportionality violative of the Eighth Amendment.

More importantly, Cannistraro ignores important factors particular to each case which very likely led the sentencing courts to impose the specific sentences cited. For example, Cannistraro, ignores that substantial cooperation with the Government is and should be taken into account in making sentencing decisions. In contrast to most of the defendants to which Cannistraro points, Cannistraro has not cooperated with the Government. On the contrary, Cannistraro, unlike most of the defendants to whom he compares himself, not only committed securities fraud, but also attempted to obstruct justice by trying to persuade a witness to conceal information from the grand jury. Moreover, while Cannistraro did plead guilty at the eve of trial, this was not the result of a plea agreement with the Government.

Although Cannistraro has attempted to show that his sentence violates the Eighth Amendment's principle of proportionality by pointing to sentences received by other

defendants, he has apparently ignored the first and central issue of the Eighth Amendment's proportionality analysis, a consideration of "the gravity of the offense and the harshness of the penalty." *Solem*, 463 U.S. at 292, 103 S.Ct. at 3010–11. For example, this was the principal concern of the Court in *Solem* in vacating, on Eighth Amendment grounds, the sentence imposed in that case. The Court held that a life sentence without the possibility for parole imposed under a recidivist statute was unconstitutionally disproportionate to the defendant's crime of uttering a worthless check for $100.00. The Court emphasized that the defendant had received the most severe punishment in that jurisdiction for one of the most passive and minor felonies a person could commit. *Id.* at 296–97, 103 S.Ct. at 3012–13.

In contrast, the gravity of Cannistraro's offenses is greater and the severity of his penalty is far less. As indicated, Cannistraro pled guilty not only to several counts of securities fraud, but also one count of obstruction of justice. The scheme in which he was involved had an enormous potential for personal gain at the expense of defrauded investors and he sought to sabotage the Government's efforts to put an end to it. His term sentence, on the other hand, is far less than the maximum to which he could have been sentenced for his offenses.

Cannistraro has not shown that his sentence was disproportionate to his crimes or that it violates the Eighth Amendment. Cannistraro was sentenced in accordance with the offenses he committed. Cannistraro's request that his sentence be reduced is denied.

### B. *Claim that the Sentencing Procedure Violated Rule 32(c) of the Federal Rules of Criminal Procedure*

Due process requires that convicted defendants be sentenced on the basis of accurate information. *United States v. Tucker*, 404 U.S. 443, 447, 92 S.Ct. 589, 591–92, 30 L.Ed.2d 592 (1972). Rule 32(c) of the Federal Rules of Criminal Procedure contains requirements which are intended to ensure that sentences are imposed in accordance with the requirements of due process.

Rule 32 provides:

(a) Sentence.

(1) Imposition of Sentence. Sentence shall be imposed without unnecessary delay.... Before imposing sentence, the court shall also

(A) determine that the defendant and his counsel have had the opportunity to read and discuss the presentence investigation report ...;

\* \* \* \* \* \*

(c) Presentence Investigation.

\* \* \* \* \* \*

(3) Disclosure.

(A) At a reasonable time before imposing sentence the court shall permit the defendant and the defendant's counsel to read the report of the presentence investigation.... The court shall afford the defendant and the defendant's counsel an opportunity to comment on the report and, in the discretion of the court, to introduce testimony or other information relating to any alleged factual inaccuracy contained in it.

\* \* \* \* \* \*

(D) If the comments of the defendant and the defendant's counsel or testimony or other information introduced by them allege any factual inaccuracy in the presentence investigation report or the summary of the report or part thereof, the court shall, as to each matter controverted, make (i) a finding as to the allegation, or (ii) a determination that no such finding is necessary because the matter controverted will not be taken into account in sentencing. A written record of such findings and determinations shall be appended to and accompany any copy of the presentence investigation report thereafter made available to the Bureau of Prisons.

Fed.R.Crim.P. 32 (as amended, effective November 1, 1987).

■ Cannistraro asserts that his sentencing violated Rule 32 and his due process rights because the PSR contained allegations which were controverted and the court failed to either make factual findings with respect to those allegations or make an explicit determination that it would not rely on such disputed allegations for sentencing purposes. The principal facts which Cannistraro claims are controverted are the amount of the fraud and whether the companies, LCI and TWC, were sham corporations.[24]

With respect to the amount of the fraud, Cannistraro and his counsel objected to the PSR as follows:

> The fraud of which Mr. Cannistraro is guilty is, at most, $250,000, as set forth in the indictment. The S.E.C. civil complaint does not allege that Mr. Cannistraro had anything to do with the $3 million in the Cayman Islands and does not seek restitution from Mr. Cannistraro.
>
> \*    \*    \*    \*    \*    \*
>
> I agree with my attorney's above comments. In addition, the companies, L.C.I. and Toxic Waste Containment, were not paper or sham corporations. I believed they would be successful and all investors would profit.
>
>                    s/Richard Cannistraro

PSR Acknowledgment Form. Furthermore, Cannistraro's trial counsel requested that reference in the PSR to fraud amounting to $3.5 million be stricken. Sentencing Transcript at 28.

At the sentencing hearing I indicated with respect to the fraud:

> It's not necessary for me to make a decision this morning as to whether it was three and a half million or whether it was $400,000.

Sentencing Transcript at 47.

Nevertheless, when determining the amount of restitution which was appropriate I relied on the figures contained in Cannistraro's sentencing memorandum:

> Now, with regard to the restitution, using the numbers taken from your attorneys' report, as I've discussed them with your attorney, I find that the M & I fund suffered a loss of $134,375. The Bullock funds [sic] suffered a loss of $125,000 and that the conspirators, your co-conspirators, enjoyed a gain of $247,-572. That total is $394,847,000, which is the amount of the restitution that will be imposed.

Sentencing Transcript at 49–50.

As indicated, Cannistraro also controverted the Government's contention that LCI and TWC were sham corporations. The Government drew an analogy between Cannistraro's companies and the sham corporation in another securities fraud case, *Laser Arms*. At the sentencing hearing I stated:

> The distinctions [sic] that has been argued between this case and *Laser* is there, to an extent, and is illusory, to another extent. It seems that these were, in fact, corporations and Laser was not a corporation so there is complete distinction. The fact of the matter is both Laser is fiction and these other two corporations, Liquid Control and Toxic Waste, were used for the same purpose, to defraud, to manipulate, to swindle. There is no way around it.

Sentencing Transcript at 47–48.

I did not make a finding as to whether the companies were sham corporations, and I did not rely on the controverted allegations of the Government. Rather, I relied on the fact admitted by Cannistraro that these companies were used for fraudulent purposes.

Rule 32(c)(3)(D) requires that when a defendant disputes facts included in a presentence report, the sentencing court must make a finding with respect to the disputed allegations or make an explicit determination that it will not rely on the disputed facts in sentencing. *United States v. Gomez*, 831 F.2d 453, 457 (3d Cir.1987). Any

---

**24.** Cannistraro also argues that other less central facts were controverted. He argues it is controverted whether an agreement existed between TWC and Thatcher Engineering, and whether TWC "ripped off" a brochure by Sherry Systems. I did not rely on these specific allegations when I sentenced Cannistraro.

findings or determinations made by the court must be appended to the report before it is sent to the Bureau of Prisons. *Id.* at 455. Thus, Rule 32(c)(3)(D) "is designed not only to insure the accuracy of the report for the sentencing judge but also for the Bureau of Prisons ... to whom it is sent." *Id.* at 457.

The Third Circuit has indicated that when a district judge chooses not to make findings as to controverted facts, the judge must make an explicit determination that it will not rely on such disputed facts. *Id.* The court explained that "[w]here the fact at issue is one that would normally affect the sentencing decision, subsequent users of a presentence report are likely to infer that the judge credited the fact unless the judge states otherwise." *Id.* The court reasoned that compliance with the rule would "prevent future readers from assuming judicial approval of the controverted facts." *Id.* (quoting *United States v. Katzin*, 824 F.2d 234, 239 (3d Cir.1987)). Once the sentencing judge has indicated whether he relied on certain facts, this indication is accepted by the appellate court. *See United States v. Santamaria*, 788 F.2d 824, 826–28 (1st Cir.1986) (when defendant contested information in presentence report, but judge stated he would not consider information in sentencing, sentencing judge did not abuse discretion, notwithstanding defendant's claim that judge must have relied on challenged information to impose harsh sentence); *United States v. Gonzales*, 765 F.2d 1393, 1396–97 (9th Cir.1985) (when defendant claims sentencing judge must have relied on challenged information in presentence report, yet judge specifically stated on record he would not rely on challenged information, court will rely on good faith of sentencing judge and accept statement of nonreliance

at face value), *cert. denied,* 474 U.S. 1068, 106 S.Ct. 826, 88 L.Ed.2d 798 (1986).

To the extent that any clarification may be necessary, I again state whether I made any findings or relied on any controverted facts. With respect to the amount of the fraud, I did not make a finding as to the total amount of the fraud, and I did not rely on controverted allegations as to the amount for purposes of determining the punitive sentence to be imposed on Cannistraro. When making a determination as to the appropriate amount of restitution which should be imposed I did rely on Cannistraro's own figures as contained in his sentencing memorandum and as discussed with his attorney at the sentencing hearing.[25] With respect to whether the companies were sham corporations, I did not make a finding and I did not rely on the controverted allegations for sentencing purposes. Rather, I looked to the fraudulent purposes for which the companies were used.

Other than as indicated, I made no factual findings with respect to controverted facts. To the extent that any facts were controverted, I did not rely on them for sentencing purposes. Because any clarification which might have been necessary has now been made, Cannistraro cannot continue to maintain that his sentencing is in violation of Rule 32(c) or of his due process rights. Thus, the request for a hearing to make further findings is denied.

### C. Challenge to Restitution Order

Cannistraro argues restitution was ordered improperly because no separate hearing was held to determine who were the victims of Cannistraro's fraud, the amount of their losses, and Cannistraro's ability to pay restitution. Thus, Cannistraro requests that the order be vacated and that a

---

25. This court's reliance on Cannistraro's own admissions was proper for the purpose of determining the amount of restitution to be required of Cannistraro's for the criminal offenses to which he pled guilty. However, this court did not undertake a judicial determination of the controverted facts concerning the scope of the fraudulent schemes in which Cannistraro was involved. These factual questions may be ap-

propriately determined in the civil case of *SEC v. Monarch Funding Corp., et al.,* No. 85–7072 (S.D.N.Y.) (L.B.S.). Additionally, the amount of restitution imposed was also a function of the financial ability of Cannistraro to pay such restitution. 18 U.S.C. § 3664(a) (1982 & Supp. IV 1986) (previous section 3580 of title 18 was renumbered 3664, effective November 1, 1987).

hearing be held to make these determinations.

The proper procedure for issuing an order for restitution is set forth in 18 U.S.C. § 3664:

(a) The court, in determining whether to order restitution ... and the amount of such restitution, shall consider the amount of the loss sustained by any victim as a result of the offense, the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate.

\* \* \* \* \* \*

(d) Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence. The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government. The burden of demonstrating the financial resources of the defendant and the financial needs of the defendant and such defendant's dependents shall be on the defendant. The burden of demonstrating such other matters as the court deems appropriate shall be upon the party designated by the court as justice requires.

Victim and Witness Protection Act ("VWPA"), 18 U.S.C. § 3664(a), (d) (1982 & Supp. IV 1986).[26]

▆▆▆ The VWPA does not require a district court to make specific factual findings concerning the amount of loss actually sustained by the victim or the defendant's financial needs and resources. *United States v. Johnson*, 816 F.2d 918, 924 (3d Cir.1987). "This Circuit, however, has invoked its supervisory powers to require district courts to make specific factual findings as to these matters before imposing restitution." *Id.* (citing *United States v. Palma*, 760 F.2d 475, 480 (3d Cir.1985) (requiring district courts in the future to make specific findings as to the factual issues that are relevant to the application of the restitution provisions of the VWPA)).

In *Palma,* the defendant argued the restitution imposed was improper because he lacked the financial means to pay for it. *Palma,* 760 F.2d at 480. The Third Circuit remanded the case so that the district court could make the appropriate factual findings. The court reasoned that such findings were necessary for meaningful appellate review of the discretionary ruling because the district court did not clearly state whether the defendant had or had not satisfied his burden of demonstrating his inability to make full restitution. The court declined to attempt to discern from the record what findings the district court might have made. *Id.*

Similarly, in *Johnson,* the Third Circuit remanded the case for specific factual findings as to the amount of loss actually sustained by the robbery victim and the defendant's financial needs and resources. *Johnson,* 816 F.2d at 924; *see also United States v. Pollack,* 844 F.2d 145 (3d Cir. 1988) (remanding for specific factual findings where district court made only conclusory finding as to defendant's ability to make restitution which was imposed under the Probation Act).

▆▆▆ In this case, the restitution order was properly imposed. At the sentencing hearing, I identified, relying on Cannistraro's submissions, the general category of the victims of the fraud. Cannistraro's sentencing memorandum indicated the victims were the innocent public investors in LCI and TWC and the shareholders of the M & I Fund and Calvin Bullock Fund. To implement the restitution order, I established a trust and appointed a trustee to determine the identities of any victims falling within these categories.

With respect to the amount of the losses of the victims for purposes of restitution only, I made a specific finding that the total loss resulting from Cannistraro's fraud was $394,847. I relied on Cannistraro's sentencing memorandum which indicated that Cannistraro's illegal gain was $247,572 and the losses to the M & I Fund

---

**26.** As mentioned, previous section 3580 of title 18 was renumbered 3664, effective November 1, 1987. Both Cannistraro and the Government refer to section 3664 in their briefs.

and the Calvin Bullock Fund were $124,375 and $25,000. Cannistraro's attorney accepted the $394,847 figure. Sentencing Transcript at 27.[27]

Cannistraro's ability to pay this restitution order was demonstrated by the fact that he had deposited with the court monies and assets worth over $500,000. Cannistraro bears the burden of demonstrating his financial resources and needs. 18 U.S.C. § 3664(d) (1982 & Supp. IV 1986). Cannistraro did not make any indication his assets were needed for any dependents. Thus, I determined Cannistraro had the financial means to pay the restitution order I imposed.[28] Because Cannistraro's restitution order was properly imposed, no further hearing is necessary.

### CONCLUSION

The actions of the Government and the orders of this court in connection with Cannistraro's assets originally posted for bail have not violated Cannistraro's Eighth Amendment or due process rights. Therefore, the Government's motion for a turn over order is granted; Cannistraro's motion for the return of the assets posted with the court is denied.

The sentence imposed on Cannistraro does not violate the Eighth Amendment and it was imposed in compliance with due process requirements and the provisions of Rule 32(c) of the Federal Rules of Criminal Procedure. The restitution order was also properly imposed pursuant to the requirements of the Victim and Witness Protection Act and the directives of the Third Circuit. Accordingly, no further sentencing proceedings are necessary; Cannistraro's Rule 35 motion is denied.

**27.** As noted above, the correct sum of the loss and profit figures is $396,947, and all orders of this court are amended to read $396,947 rather than $394,847 with respect to the amount of restitution. *See supra* note 5.

**28.** Because of Cannistraro's arguments concerning the limited amount of his assets, it was not necessary to go beyond Cannistraro's stated financial capabilities in determining the appropriate amount of restitution. Any amount significantly in excess of Cannistraro's stated assets would be beyond his ability to effect such restitution.